SIMON J. FRANKEL  (Bar No. 171552)
EVAN R. COX (Bar No. 133229)
COVINGTON & BURLING LLP
One Front Street, 35th Floor
San Francisco, California  94111
Telephone:    (415) 591-6000
Facsimile:    (415) 591-6091
Email:       sfrankel@cov.com
             ecox@cov.com

TIMOTHY C. HESTER*
DEREK LUDWIN*
JONATHAN GIMBLETT*
MONIQUE M. O'DONOGHUE*
COVINGTON & BURLING LLP
1201 Pennsylvania Avenue, N.W.
Washington, D.C.  20004-2401
Telephone:    (202) 662-6000
Facsimile:    (202) 662-6291
Email:       thester@cov.com
* pro hac vice application pending

E-filing

Attorneys for Plaintiff
SAMSUNG ELECTRONICS CO., LTD

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

CV 10 3098

| | |
|---|---|
| SAMSUNG ELECTRONICS CO., LTD., a Korean corporation, | Case No. |
| Plaintiff, | **COMPLAINT** |
| v. | **DEMAND FOR JURY TRIAL** |
| PANASONIC CORPORATION, a Japanese corporation; PANASONIC CORPORATION OF NORTH AMERICA, a Delaware corporation; and SD-3C LLC, a Delaware limited liability company. | |
| Defendants. | |

Plaintiff Samsung Electronics Co., Ltd. ("Samsung"), by its attorneys, brings this action for damages, a declaratory judgment and injunctive relief, against Defendants Panasonic Corporation, Panasonic Corporation of North America (collectively "Panasonic") and SD-3C LLC ("SD-3C") (together with Panasonic, "Defendants").  Samsung alleges as follows:

## INTRODUCTION

1.    In this action, Samsung seeks relief from the anticompetitive agreements that Panasonic and SD-3C have reached with SanDisk and Toshiba in connection with the development and licensing of the Secure Digital Memory Card ("SD Card"), a type of flash memory card that has become the dominant industry standard since its launch in 2000.  The agreements in question constitute violations of federal antitrust and patent laws, as well as California's Cartwright and Unfair Competition Laws.

2.    Prior to the launch of the SD Card, the flash memory card industry was characterized by vigorous competition.  Rapid innovation produced a profusion of competing flash memory card formats.  The principal manufacturers—including Panasonic, SanDisk and Toshiba—made extensive use of open standard-setting organizations in an attempt to win industry-wide acceptance for their own formats.  For example, SanDisk joined and agreed to abide by the rules of the MultimediaCard Association ("MMCA"), which developed a standard for the MultimediaCard ("MMC") based on a format originally developed by SanDisk.

3.    In August 1999, Panasonic reached an agreement with SanDisk and Toshiba (all three collectively, the "SD Group") that fundamentally changed the nature of competition in the industry.  These three leading competitors agreed to limit competition among themselves in order to develop the SD Card as a new industry standard over which they could exercise collective control.

4.    The SD Group employed numerous anticompetitive methods to achieve their goals.  They bypassed the open standard-setting process for the MMCA and entered into an agreement among themselves to devise a modification of the existing MMC specification to serve as the first version of the SD Card specification.  At least one member of the SD Group subsequently took repeated steps, in violation of its obligations as a member of the MMCA, to

1   prevent the successful launch of MMC products that might offer effective competition to the SD

2   Card.

3           5.      Having excluded the other MMCA member companies from their

4   deliberations, the SD Group manipulated the SD Card specification to ensure that it arbitrarily

5   required the use of patent rights owned by SD Group members.  To secure acceptance of this

6   specification, without having to follow the existing rules of the MMCA, the SD Group members

7   formed the SD Association, a new standard-setting body operating under rules devised by and

8   favoring the interests of the SD Group.  Then the SD Group formed SD-3C LLC to enforce

9   against other industry participants a discriminatory licensing scheme that imposed

10  supracompetitive royalties on any other company wishing to manufacture SD Cards, while

11  holding back for separate licensing by each member of the SD Group (and a further royalty) the

12  memory technology rights needed for SD Cards.

13          6.      The conspiracy among the SD Group and SD-3C has significantly altered

14  and restrained competition.  The SD Card has become the dominant flash memory card format.

15  The SD Group's three members have become the dominant manufacturers of SD Cards

16  accounting for 65-70 percent or more of the U.S. market.  The SD Group has imposed

17  discriminatory royalty obligations on rival manufacturers that have impeded competition in the

18  market for SD Cards and reduced innovation in the flash memory technology market.  No

19  significant new formats have been launched since the SD Card.  Panasonic and Toshiba have

20  withdrawn pre-existing formats of their own, further limiting competition to the SD Card.

21          7.      The agreements between Panasonic, SD-3C and the other members of the

22  SD Group violate Sections 1 and 2 of the Sherman Act.  They violate Section 1 because they are

23  agreements between competitors that suppress competition and that create anticompetitive

24  effects that are not outweighed by countervailing procompetitive benefits.  They violate Section

25  2 of the Sherman Act because the agreements constitute a conspiracy to monopolize the market

26  for SD Card technology.  That conspiracy has resulted in the unlawful acquisition and

27  maintenance by SD-3C of a monopoly in the market for SD Card technology—a further

28  violation of Section 2.  In addition, Defendants have engaged in patent misuse by demanding

royalties on the sale of unlicensed memory under the SD Card license and have violated both the Cartwright Act and Section 17200 of the California Business and Professions Code.

8.    Samsung has been injured and continues to suffer injury as a result of Defendants' violations of federal and state law.

## THE PARTIES

9.    Plaintiff Samsung Electronics Co., Ltd. is a corporation organized under the laws of the Republic of Korea with its principal place of business at 416 Maetan-dong, Youngtong-gu, Suwon, Kyunggi-Do, 443-742, Korea.

10.    Defendant Panasonic Corporation is a Japanese corporation, with its headquarters at 1006, Oaza Kadoma, Kadoma-shi, Osaka 571-8501, Japan. Prior to October 2008, Panasonic Corporation was known as Matsushita Electric Industrial Co., Ltd.

11.    Defendant Panasonic Corporation of North America, a Delaware corporation, is, upon information and belief, a wholly owned subsidiary of Panasonic Corporation, with its principal place of business at One Panasonic Way, Seacacus, New Jersey 07094, and is doing business in this district.

12.    Defendant SD-3C LLC is a Delaware limited liability company with its principal place of business at 180 Montgomery Street, Suite 1840, San Francisco, California 94104. On information and belief, SD-3C has conducted licensing activities through its agent, Miller, Kaplan, Arase & Co. LLP, at that address.

## JURISDICTION AND VENUE

13.    This Court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331, 1337(a), and 1367, insofar as Samsung seeks declaratory relief addressing issues arising under federal patent and antitrust law and asserts claims of violations of the Sherman Act. The Court has jurisdiction under 28 U.S.C. § 1332, in that the matter in controversy is between a citizen of a foreign state and citizens of a state, and the amount in controversy, exclusive of interest and costs, exceeds $75,000. The Court may grant declaratory relief in this action pursuant to 28 U.S.C. §§ 2201 and 2202.

14.    A substantial part of the events or omissions giving rise to this Complaint

1   occurred in this District.  Upon information and belief, SD-3C transacts business in this District,

2   both directly and through its agent, and is subject to personal jurisdiction in this District.

3   Furthermore, SD-3C has consented to venue in this District.  As such, venue is proper in this

4   Court pursuant to 28 U.S.C. §§ 1391 and 1400 and 15 U.S.C. § 22.

5                           **INTRA-DISTRICT ASSIGNMENT**

6           15.    The SD Group established SD-3C with its principal place of business in

7   San Francisco County, where a substantial part of the events or omissions giving rise to this

8   action occurred.  Pursuant to Local Rule 3-2(d), "all civil actions which arise in the count[y] of .

9   . . San Francisco . . . shall be assigned to the San Francisco Division or the Oakland Division."

10  Therefore, assignment to the San Francisco Division of this Court is appropriate.

11                            **FACTUAL ALLEGATIONS**

12          16.    Since their initial development in the late 1980s, flash memory cards have

13  become a key ingredient in the modern information economy, facilitating the storage of

14  constantly increasing amounts of information on ever-smaller devices.  Vigorous competition

15  between different technologies and flash card manufacturers during the 1990s helped drive rapid

16  product improvements and steadily declining prices.  This complaint arises from the decision of

17  three leading producers of flash memory cards to cease competing with each other and to seek

18  market dominance jointly through agreements on future product specifications and royalties

19  charged to the industry that have given them a permanent cost advantage and have restricted

20  competition in technology and product markets.  These efforts have harmed, and continue to

21  harm, both Samsung and competition more generally.

22  **A.      Background on the Technologies and Products at Issue in this Case**

23          **1.      Flash Memory**

24          17.    Flash memory was developed in the early 1980s by Toshiba and is now

25  widely used in consumer electronics devices, either as embedded memory within devices or in

26  the form of flash memory cards that can be slotted into and can communicate with those

27  devices.

28

18.     One of the distinctive features of flash memory is that it is non-volatile, meaning that it can retain data without a continuous power source, unlike the Dynamic Random Access Memory ("DRAM") traditionally used in computer hard drives. Flash memory is also solid state, meaning that it contains no moving parts and is therefore shock-resistant. An additional advantage of flash memory is that it can be read and programmed faster than many other types of memory.

19.     These qualities have helped flash memory become the dominant technology for storing data in numerous types of consumer electronic devices, including digital cameras, digital audio players, and cellular telephones. Flash memory is a critical component in such commercially successful products as the iPod and the iPhone. It is also increasingly used in solid state hard drives for personal computers.

20.     The two main types of flash memory are NOR and NAND. In NOR flash memory, the memory cells are arranged in parallel. Because this architecture permits random access to data, NOR flash is well-suited for programming applications, such as code storage and execution. In NAND flash memory, the cells are arranged in series. While this architecture prevents random access to data, it allows for significantly faster write and erase operations and a higher storage density than NOR. These characteristics make NAND the preferred form of flash memory for use in data storage applications. Accordingly, the flash memory used in consumer electronic devices is almost exclusively NAND.

21.     Panasonic, Toshiba and SanDisk each claim patent rights bearing on NAND flash technology. Each of them demands royalties from other manufacturers of NAND flash memory based on these rights.

### 2.      Flash Memory Cards

22.     A significant proportion of NAND flash memory reaches consumers already built into (or "embedded" in) digital devices. Approximately 40-50 percent of NAND flash memory output, however, is sold in the form of flash memory cards. Flash memory cards are portable data storage media that can be inserted directly into compatible slots on host devices such as laptop computers, digital cameras and mobile phones. Flash memory cards

typically combine a flash memory chip with a controller (a chip that manages read, write and erase instructions received from the host device), packaged together in a plastic casing. Because of its higher density, NAND flash memory is particularly well-suited for use in flash memory cards, and the majority of flash memory cards in use today incorporate NAND flash memory chips.

23.    Flash memory chips are made in large, specialized manufacturing facilities (also known as fabs) by manufacturers that include Toshiba, SanDisk (through a joint venture with Toshiba) and Samsung. The chips are combined with other components to form flash memory cards in a separate manufacturing process, either by the memory manufacturer itself or by a smaller manufacturer or assembler to which the memory manufacturer sells its chips. Panasonic, Toshiba, SanDisk and Samsung all manufacture flash memory cards incorporating their own flash memory chips. Examples of smaller manufacturers and assemblers include A-Data, Apacer, Corsair Microsystems, Dane-Elec, Kingston, PNY, PQI, Transcend, TSR, Buffalo and Phison Electronics.

24.    A given flash memory card can only be used in host devices that have a compatible slot corresponding to that card's "form factor" (the size and shape of the card) and appropriate "driver" software (also called host interface software) to allow the host device to communicate with the memory card. Without the appropriate driver software, an otherwise physically compatible card (i.e., a card that physically fits into a slot in the host device) may not work properly in that device.

**B.    Competition in the Flash Memory Card Industry in the 1990s**

25.    The development of flash memory cards since they first appeared in the late 1980s has been conditioned by two factors. First, flash memory card manufacturers have had to innovate constantly to achieve the smaller form factors, faster processing times, and increased data storage capacities required by design improvements in host devices (for example, the development of smaller, higher resolution digital cameras). Second, because consumers value the convenience of being able to use the same flash memory card format in different host devices, flash memory card manufacturers have an incentive to promote broad acceptance of

their own formats. During the 1990s, these two factors fostered vigorous technological competition among flash memory card manufacturers, reflected in the release of numerous competing card formats, accompanied by efforts by individual manufacturers to promote industry-wide adoption of their own formats as open standards.

26.    The first flash memory cards were generally proprietary designs, such that each one worked only with that manufacturer's products. By the late 1980s, the industry recognized that in order to advance the acceptance and use of flash memory cards it was necessary to standardize the flash card formats. Accordingly, in 1989, 25 vendors joined together to form a non-profit, open standards organization called PCMCIA (Personal Computer Memory Card International Association) to develop a universal memory card format for laptop computers.

27.    The PCMCIA developed a set of protocols describing the form factor and operating characteristics of a NOR-based flash memory card format called the PC Card. The first PC Card specification was published in 1990. The PC Card was an open standard. As an open standard, no company controlled the PC Card format and multiple vendors competed to supply the market with interoperable memory cards that complied with the format.

28.    During the mid-1990s, the major flash memory card manufacturers competed to develop smaller memory card formats and to have those formats adopted as open standards by other manufacturers. Panasonic, Toshiba and SanDisk were prominent horizontal competitors at this time, each developing and promoting new formats of their own.

29.    In 1994, SanDisk developed the CompactFlash format, a NOR-based flash memory card with a smaller form factor than the PC Card but that could be used in a PC Card slot by means of an adapter. To promote the card as a standard, SanDisk agreed to transfer its Compact Flash trademark and technical specifications to the CompactFlash Association, an open standard-setting body, which made the specifications available under a royalty-free license to other third-party manufacturers that committed to develop, manufacture and supply CompactFlash products.

30.    In 1995, Toshiba launched the SmartMedia format, a small NAND-based

flash memory card format with no on-board controller, which it proposed as a standard.  The SmartMedia Format was promoted as an open, royalty-free standard by the SSFDC (Solid State Floppy Disk Card) Forum.

31.    In 1997, Panasonic announced its own NAND-based flash memory card, the Mega Storage Device, previously known in Japan as the SmallPC Card, to target digital cameras, personal digital assistants, and other portable devices.

32.    Also in 1997, Siemens and SanDisk jointly developed and introduced the MultiMediaCard ("MMC Card") specification, a high-density NAND-based flash memory card format, with a form factor about the size of a postage stamp.  On information and belief, the development of the MMC Card was encouraged by Nokia, which wanted a smaller form factor memory card for use in cellular telephones.  On information and belief, Nokia wanted the MMC Card to be an open standard.

33.    Accordingly, in 1998, Siemens, SanDisk and 12 other companies announced the establishment of the MultiMediaCard Association ("MMCA") "to make the MultiMediaCard a broadly supported new industry standard."  The MMCA had two types of members, executive and affiliate.  At its inception, executive members were asked to pay a modest fee of $5,000 to join—and to have full voting rights—while affiliate members were asked to pay only $2,500.  All MMCA members were entitled to access and use the MultiMediaCard specification to develop, manufacture and supply MultiMediaCard products on a royalty-free basis.  All executive members were entitled to participate on an equal basis in the development of specifications and standards.  Samsung joined the MMCA in 2002 and began manufacturing MMC cards at that time.

34.    SanDisk's 1998 SEC Annual Report commented on the "intense competition, rapid technological change [and] evolving industry standards" that characterized the flash memory card market at that time.  The report identified both Toshiba and Panasonic as horizontal competitors in the development of flash memory cards and flash memory card technology, observing that:

"Competing products promoting industry standards that are

1    different from SanDisk's have been introduced, including Intel's
2    Miniature Card, Toshiba's Smart Media (Solid-State Floppy Disk
    Card), Sony Corporation's Memory Stick, and Panasonic's
3    recently introduced Mega Storage cards . . . ."

4        35.   The annual report specifically noted that "our MultiMediaCard products

5    are expected to face stiff competition from Toshiba's SmartMedia flash cards" together with

6    Sony's Memory Stick.

7        36.   By the time SanDisk released its next annual report, covering the 1999

8    calendar year, the company had embarked on a course of action in concert with Panasonic and

9    Toshiba that was to alter fundamentally the nature of competition in the flash memory card

10    industry.

11      **C.**    **Panasonic, SanDisk and Toshiba Agreed to Limit Competition and to**
            **Achieve Dominance by Anticompetitive Means.**
12

13        37.   Prior to 1999, Panasonic, SanDisk and Toshiba were major horizontal

14    competitors in the flash memory card technology and product markets. Each of these

15    companies had supported open standard-setting as a means of gaining a competitive edge for

16    their formats. Prior to 1999, open standard-setting was the norm in the flash memory card

17    industry for manufacturers that wished to promote broader adoption of a particular format

18    among different host manufacturers. While some single-company proprietary formats, such as

19    Sony's Memory Stick, had enjoyed limited commercial success, competitor collaborations to

20    promote a jointly-owned proprietary standard were highly unusual.

21        38.   On August 25, 1999, Panasonic revealed that it was working with SanDisk

22    and Toshiba pursuant to an agreement that marked a radical departure from the competitive

23    norms underpinning the development of the industry over the previous decade. Under this

24    agreement, the three companies agreed to develop a modified version of the MMC Card in a

25    closed process from which other industry participants were excluded. On information and

26    belief, the aim of the three companies in subverting the open standard setting work of the

27    MMCA was to establish a new dominant standard under their joint control. The SD Group used

28    its control of the new format to establish a regime for the SD Card that discouraged the

1  emergence of new competing technologies and that insulated Panasonic, SanDisk and Toshiba

2  from competition by imposing an unreasonable and discriminatory royalty on other industry

3  participants.

4       39.    As described in SanDisk's 1999 SEC Annual Report, the agreement

5  announced in August 1999 was:

6       "[A] memorandum of understanding under which we, Matsushita
        and Toshiba will jointly develop and promote a next generation
7       flash memory card called the Secure Digital Memory Card.  The
        Secure Digital Memory Card is an enhanced version of our
8       MultiMediaCard that will incorporate advanced security and
9       copyright protection features . . . ."

10      40.    As the same document indicated, Panasonic, SanDisk and Toshiba—which

11  now referred to themselves collectively as the "SD Group" in licensing and other documents

12  related to Secure Digital Memory Cards—were not uniquely qualified to bring this additional

13  functionality to the marketplace.  The annual report observed that "Hitachi, Infineon, Sanyo and

14  Fujitsu have proposed their Secure MultiMediaCard which provides the copy protection

15  function that is included on our Secure Digital Memory Card."

16      41.    SanDisk was a founding member of the MMCA, an open standard-setting

17  organization that had as its mission "to encourage all interested members of industry to join in

18  the development and marketing of MultiMediaCard-based technologies."  As such, the MMCA

19  was the natural forum for any development work on an enhanced version of the

20  MultiMediaCard.  On information and belief, there was nothing about the additional

21  functionality that the SD Group incorporated into the SD Card that would have prevented the

22  MMCA from achieving the same result under its open standard-setting rules.  The combination

23  of Panasonic, SanDisk and Toshiba was not necessary to achieve the modest technical advance

24  represented by the SD Card.

25      42.    On information and belief, Panasonic encouraged SanDisk to join with it

26  and Toshiba in developing the SD Card outside of the MMCA structure.  In addition to being a

27  significant competitor of SanDisk and Toshiba in the flash memory card market, Panasonic was

28  (like Toshiba) also a major manufacturer of host devices and was therefore well-placed to push

for adoption of the new format by the consumer electronics industry. The SD Group induced other manufacturers of host devices to adopt the SD Card format by offering them royalty-free licenses to incorporate SD Card functionality into their products (in contrast to the supracompetitive royalties charged to SD Card manufacturers, as described below) and by promising to make SD Cards backwardly compatible with the MMC format.

43.    By combining their respective market weights, Panasonic, SanDisk and Toshiba could thus achieve critical mass for the new format under rules of their own choosing, without having to resort to open standard-setting. As an official of SanDisk, then the largest manufacturer of flash memory cards in the world stated at the time: "The combination of these three firms gives strength. That's why they came to SanDisk."

44.    If Panasonic, SanDisk and Toshiba had chosen to proceed within the MMCA, their standard-setting activity would have been subject to the MMCA Policies and Procedures (the "MMCA Policies"). Under the MMCA Policies, the SD Group would have been required to circulate to other members a request for approval to proceed with a change to the MMCA Standard and the change would then have been considered and approved by the relevant technical committee and subsequently the MMCA Board of Directors.

45.    In addition, the SD Group would have been subject to the MMCA's disclosure and licensing policy on intellectual property. That policy would have required disclosure to the group of any patent rights covered by the SD Group's proposal:

> "When considering whether proprietary technology should be included, the Association balances the benefits of such technology with the burden of compliance with licensing requirements. As such, it is essential to the Association's success that it be fully informed of the existence of proprietary technology in any proposal for inclusion in the specification, at the first showing of that proposal in an Association meeting.

> Any party submitting a proposal for inclusion in the specification will be required to disclose, at the time of submittal, all known proprietary technology included in the submission. . . . The Association expects that the proposal sponsor will use reasonable diligence to determine if proprietary technology is included in the proposal. Failure to

1

2

use reasonable diligence or make this disclosure is grounds for
expulsion from the Association."

3     46.    Such disclosure would have allowed the MMCA members to assess the

4   potential licensing costs associated with the new proposal, secure non-discriminatory licensing

5   commitments, and take into account their policy preference for technologies that can be licensed

6   royalty free, according to which:

7

8

9

"[T]he Association will only include a member company's
proprietary technology in it's [sic] specification if the owner of
that technology agrees to reasonable and nondiscriminatory
licensing terms set forth below."

10     47.    Rather than work within these constraints and submit the development of

11   the SD Card to the MMCA, however, Panasonic, SanDisk and Toshiba elected to form a new

12   group.  Freed from the MMCA's even-handed rules and patent disclosure and licensing policies,

13   the SD Group has designed and (with SD-3C) enforced a regime for the SD Card that restrains

14   competition among flash memory card technologies and in the sale of flash memory card

15   products, imposes discriminatory licensing royalties, and has resulted in the unlawful

16   monopolization by SD-3C of the market for SD card technology.

17     **D.    The Anticompetitive Nature of the SD Card Regime**

18     48.    By a series of agreements that remain in force today, the SD Group and

19   SD-3C have created and maintain a regime for the SD Card that improperly favors the interests

20   of Panasonic, SanDisk and Toshiba, while imposing unreasonable burdens on other industry

21   participants.  Among other things, the SD Group: (1) has manipulated the SD Card specification

22   to ensure that it can only be implemented by practicing patent rights owned by SD Group

23   members; (2) dictates rules for the SD Association that unfairly favor the interests of the SD

24   Group over those of other members; (3) with SD-3C, imposes a discriminatory licensing scheme

25   on other industry participants that gives SD Group members a significant and permanent cost

26   advantage over their competitors in the manufacture of SD Cards; and (4) has eliminated or

27   suppressed the emergence of other competing formats.

28     49.    The agreement among the SD Group to create the SD Card has not

generated efficiencies sufficient to save it from condemnation under the antitrust laws. If the SD Group had allowed the MMCA to play the role for which it was created, the MMCA could have developed a flash memory card with the same characteristics as the SD Card and would have done so under open standard-setting rules that promote rather than restrain competition. Even if the agreement to create the SD Card was found to be justified by procompetitive benefits, however, numerous features of the standard-setting and licensing regime established by the SD Group and SD-3C would nonetheless violate the antitrust laws as restrictions on competition that are not necessary to achieve a legitimate procompetitive purpose.

50. Defendants' ongoing anticompetitive conduct has injured and continues to injure both Samsung and competition generally.

### 1. The SD Group's Manipulation of the SD Card Specification

51. Panasonic, SanDisk and Toshiba issued the first version of the SD Card specification (the "Specification") in March 2000.

52. The SD Group's approach to the Specification represented a radical departure from the previous practice in the flash memory card industry, reflected by such open standards organizations as the CompactFlash Association and MMCA. During the 1990s, SanDisk and other manufacturers had encouraged industry-wide adoption of formats they had already developed by allowing competitors to implement the corresponding specification on a royalty-free basis. The August 1999 agreement among Panasonic, SanDisk and Toshiba, by contrast, related to future arbitrary amendments to the existing MMC specification that the three companies subsequently would share only with memory card manufacturers that promised to pay a hefty royalty.

53. By choosing to agree among themselves on the Specification without inviting input from or making disclosure to other parties, the SD Group members ignored guidance addressed to, among others, Panasonic and Toshiba by the U.S. Department of Justice ("the DOJ") in a business review letter of June 10, 1999 related to DVD licensing practices. That letter described the potential anticompetitive nature of the inclusion in patent pools of non-essential patents. In view of the economic incentive that collaborating licensors have "to

combine in the pool their competing . . . patents and to foreclose others' competing patents," the DOJ stressed the importance of engaging a genuinely independent expert "to undertake a disinterested review of the 'essentiality' of the patent rights put forward." The DOJ's letter also warned that inclusion in a pool of one of several competing non-essential patents could "unreasonably foreclose the non-included competing patents from use by manufacturers."

54.    By excluding other companies from their deliberations, and by failing to engage an independent expert, the SD Group was able to craft a Specification that, to this day, favors their own intellectual property rights. The SD Group did this by drafting the Specification to mandate particular technological solutions for certain new features that could have been left to the discretion of the manufacturer without affecting the core functionality of the card. Members of the SD Group then filed patent applications to cover the mandated solutions.

55.    For example, SD-3C asserts that the Specification cannot be implemented without infringing two Panasonic patents covering a mechanical write protect switch that prevents consumers from accidentally overwriting the card and destroying data, images or audio. Those patents derive from applications first filed by Panasonic on August 6 and 24, 1999—immediately before the SD Group's first public announcement on August 25, 1999 that it was collaborating on the creation of an SD Card. There was no sound reason to require the practice of Panasonic's technology in this way. The SD Group could have written the Specification so as to allow mechanical write protection to be implemented by a variety of means.

56.    On information and belief, many SD Cards available for purchase in the United States do not operate in conformity with aspects of the Specification covered by the SD Group's purported essential patents and yet function satisfactorily in SD host devices. Similarly, SD Cards purchased in the United States can be made to function satisfactorily even when modified to operate outside parameters defined in the Specification and without practicing SD Group patents that are purportedly essential for implementing the Specification. The fact that SD Group patents described by SD-3C as essential for the implementation of the

Specification are not needed to create an SD Card that functions satisfactorily is further evidence that the Specification has been manipulated by the SD Group to serve the interests of Panasonic, SanDisk and Toshiba.

57.    As a result of the arbitrary and self-interested way in which Panasonic and the other SD Group members have created a Specification that requires the practice of their own patents to implement non-essential features, alternative technologies for implementing such features in a more cost-effective manner have been foreclosed.  By writing a Specification that artificially rendered their own patents essential, the SD Group also created the basis for a licensing scheme that effectively insulated SD Group members from competition.

### 2.    The Unequal Rules Imposed by the SD Group on the SD Association

58.    The SD Group announced the establishment of the SD Association ("SDA") on January 6, 2000, at a joint press conference at the Consumer Electronics Show in Las Vegas.  On information and belief, the SD Group required, as a condition of membership in the SDA, that companies agree to observe association rules designed by the SD Group members to entrench their own privileged position within the organization.

59.    For example, the Intellectual Property Policy (the "IP Policy") developed by the SD Group for the SDA includes a disclosure requirement that, unlike the MMCA policy, effectively permits the SD Group to conceal the specific patent rights owned by SD Group members that it claims are essential for implementation of the original Specification.  Thus, with respect to future recommendations to amend the Specification, the IP Policy requires members of the SDA to make highly specific disclosures—including patent numbers and the existence of pending applications—of any rights owned by them that would be needed to implement the proposed Specification.  Under the IP Policy, however, SD Group members were not required to make any correspondingly detailed disclosure of rights owned by them and already embedded in the initial versions of the Specification.  Instead, the IP Policy includes a vague statement purporting to provide an after-the-fact "notice" that the Specification "contain[s] intellectual property" held by the SD Group members and that such notice "shall be a sufficient disclosure."

60.    On information and belief, the SD Group has relied on this provision of the

IP Policy to avoid disclosing the specific patents owned by Panasonic, SanDisk and Toshiba that it contends are essential for implementation of the Specification. To date, SD-3C has disclosed on its website only 11 patents owned by SD Group members that "are necessarily and unavoidably infringed by a product that implements the secure digital technology in compliance with the SD Group Specifications." According to SD-3C, "[t]he list is for information purposes only, it is offered by way of example and may not be exhaustive." Panasonic has asserted in discussions with Samsung that it believes it owns a further 29 patents that are essential for implementation of the Specification. Panasonic has not, however, disclosed those patents to the SDA membership.

61.    In a business review letter of November 12, 2002 concerning 3G wireless communications technology, the DOJ indicated that the pooling of patents among competitors might be justified where there was "the potential for efficiencies with respect to the generation and dissemination of information about essential . . . patents, and the identification and evaluation of which patents are actually essential" to the technology in question. The agreement among Panasonic, SanDisk and Toshiba to combine their SD Card patents cannot be justified on this ground because the SD Group has made affirmative efforts to bypass the prior MMCA rules and use the creation of the SDA to avoid full disclosure of patents claimed by them to be essential to implementation of the Specification. By creating doubt among other industry participants as to the actual scope of their patents bearing on SD Cards, the SD Group's non-disclosure policy discourages third party innovation in SD Card technologies and thereby harms competition.

62.    Even if the creation of the SD patent pool could be justified on the basis of its potential efficiencies, the discriminatory standard-setting rules imposed on the SDA by the SD Group are not necessary to achieve those efficiencies.

### 3.    The SD Group's and SD-3C's Anticompetitive Licensing Scheme

63.    The SD Group and SD-3C require companies that wish to manufacture SD Cards to enter into an SD Memory Card License Agreement (the "SD Card License"), which grants licensees rights to the purportedly essential patent claims, the Specification, and the SD

logo and trademark. In contrast to the royalty-free terms on which rights to CompactFlash, the MMC Card and other formats had previously been offered, the SD Card License requires licensees to pay a 6 percent royalty on their net sales of SD Cards. On information and belief, Panasonic, SanDisk and Toshiba have agreed to license their purportedly essential SD Card technology exclusively through the SD Card License.

64.     In parallel with their agreement to license their SD Card patents exclusively through SD-3C and at a single price, the members of the SD Group have entered into cross-licensing arrangements that allow them to enjoy a permanent cost advantage over competing manufacturers of SD Cards. In its 1999 annual report, SanDisk disclosed:

> "While other flash card manufacturers will be required to pay the
> SD Association license fees and royalties which will be shared
> between Matsushita, Toshiba and SanDisk, there will be no
> royalties or license fees payable among the three companies for
> their respective sales of the Secure Digital Memory Card."

Accordingly, the effect of the SD Card License is to raise rivals' costs of manufacturing SD Cards relative to the costs incurred by SD Group members.

65.     The SD Card License also includes a discriminatory grantback provision that has the effect of entrenching the SD Group's control over SD Card technology. Article 2.4 of the SD Card License requires licensees to grant to each member of the SD Group:

> "under the Essential Patent Claims Licensable by Licensee, a
> non-exclusive, non-transferable, royalty-free license to and
> release from any and all claims of infringement, on a worldwide
> basis, to make, design, have made, use, offer to sell, sell, import,
> export or otherwise dispose of SD Memory Cards . . . ."

The requirement that licensees give SD Group members royalty-free access to any new essential technology they might develop contrasts with the 6 percent royalty demanded by SD Group members for their own essential patent claims. This unequal provision eliminates any financial incentive other manufacturers might have to develop new SD Card technologies and thereby to challenge the control exercised over those technologies by the SD Group.

66.     The grantback provision of the SD Card License fails to protect against the

threat of anticompetitive harm associated with such provisions. In its 1999 business review letter related to DVD licensing practices, the DOJ recognized the potential for grantback provisions to result in "significant discouragement of research and development." The letter indicated that this potential can be alleviated by arrangements that ensure that licensees subject to a grantback provision benefit from introducing new essential patents into the pool. Because the SD Card License grantback provision lacks this or any other redeeming feature, its potential to harm competition among technologies is unmitigated.

67.     Although the SD Card License requires licensees to pay a 6 percent royalty, the license by its terms does not provide licensees with all the rights needed to manufacture an SD Card. Article 2.3 of the SD Card License provides:

> "IT IS EXPRESSLY UNDERSTOOD THAT THE RIGHTS AND LICENSES GRANTED PURSUANT TO THIS AGREEMENT DO NOT EXTEND TO ANY SEMICONDUCTOR MEMORY TECHNOLOGY OR SEMICONDUCTOR PROCESS/PACKAGING TECHNOLOGY."

68.     On information and belief, Panasonic, SanDisk and Toshiba claim substantially all of the flash memory technology rights needed to manufacture an SD Card. Instead of including these rights within the scope of the SD Card License, however, these companies have agreed to hold back their flash memory rights from the SD Card License. Each of Panasonic, SanDisk and Toshiba requires competing manufacturers of SD Cards to license their respective flash memory rights in separate bilateral license agreements, thereby extracting additional royalties that increase the cost advantage enjoyed by SD Group members in the manufacture of SD Cards.

69.     Even if the joint licensing of the SD Group's patents could be justified on the basis of its potential efficiencies, the supracompetitive royalties, discriminatory grantback and other anticompetitive features of the SD Card License are not necessary to achieve those efficiencies.

70.     Although the SD Card License purports to exclude flash memory rights from its scope, the license specifies that the 6 percent royalty is payable on net sales of SD Cards, rather than on a per-card basis. The price of an SD Card, and therefore the amount of

royalty owed, is generally proportional to the amount of flash memory contained within it. For example, the advertised price of SanDisk SD/SDHC Cards at www.flash-memory-store.com on July 15, 2010 was $9.95 for 2 GB, $14.95 for 4 GB, $21.95 for 8 GB, $34.95 for 16 GB and $73.95 for 32 GB. The cost of non-memory components in SD Cards does not vary significantly, regardless of the memory capacity of the card in which they are incorporated. By requiring royalties to be calculated based on net sales, the SD Card License therefore effectively requires that licensees pay a royalty with respect to the quantity of memory included in an SD Card, even though that memory is expressly excluded from the scope of the license grant.

71.    In early 2003, Samsung sought to obtain an SD Memory Card License at the request of a customer that wished to sell SD Cards assembled by Samsung using Samsung memory components. At the direction of an official from Toshiba, Samsung approached Michael Quackenbush in the San Ramon office of Lindquist CPA, who was acting as SD-3C's licensing agent at the time, to secure a license to produce SD Memory Cards. Mr. Quackenbush refused to engage in any negotiations of license terms with Samsung. For example, Samsung asked early in this discussion that Mr. Quackenbush send a Word version of the SD Memory Card License proposed by the SD Group, to facilitate the exchange of counter-proposals. After initially indicating his assent to this proposition, Mr. Quackenbush subsequently communicated to Samsung that: "I have been asked to not provide the license agreement in a word file to any company. The SD-3C managers are concerned about anyone making changes to the agreement."

72.    The SD Memory Card License therefore was offered to Samsung without any opportunity for modification or negotiation of its terms. On September 24, 2003, Samsung signed the agreement in the form offered by SD-3C, without being given any ability to modify or negotiate the contract. The agreement was subsequently signed by officials of Panasonic, SanDisk and Toshiba on behalf of SD-3C.

73.    Samsung began manufacturing SD Memory Cards in its own right in early 2006. By mid-2009, Samsung had paid more than $80 million to SD-3C in royalties pursuant to its SD Memory Card License.

### 4.     Elimination and Suppression of Competing Formats

74.     In addition to exercising collective control over the SD Card format, the SD Group has sought to restrain competition among flash memory cards more broadly by eliminating existing formats that compete with the SD Card and by suppressing the emergence of new competing formats.

75.     SD Group members have withdrawn their own pre-existing formats from the market. On information and belief, Toshiba discontinued sales of its SmartMedia card in 2002. On information and belief, Panasonic ceased marketing its Mega Storage format in or around 2002.

76.     On multiple occasions, one or more members of the SD Group, acting in furtherance of the SD Group's unlawful purposes, have participated in anticompetitive conduct designed to impede the development of MMC formats that would have competed with SD Cards. Most recently, in March 2006, SanDisk intervened at the last minute in negotiations at the European Telecommunications Standards Institute (ETSI), disclosing MMC-related patent rights in order to prevent the adoption by ETSI of an MMC-based standard for high-speed SIM (Subscriber Identity Module) cards for use in mobile phones. SanDisk informed ETSI that it would not provide the commitment to license other manufacturers on "fair reasonable and non-discriminatory terms" that ETSI's rules required in order to move forward with an MMC-based SIM card standard. On information and belief, SanDisk had failed to disclose these same patents to the MMCA, while it was a member of the board of directors and/or an executive member of that organization. By contrast, SanDisk told ETSI that it would agree to license its patents on fair, reasonable and non-discriminatory terms to other vendors for a SIM card standard based on USB, rather than MMC, technology. As a result of SanDisk's intervention, ETSI's decision on high-speed SIM cards was delayed. After SanDisk had made an unsuccessful attempt to persuade ETSI to adopt an SD Card-based standard, ETSI eventually opted for the USB option notwithstanding the fact that, according to contemporary reports, "handsets that can run MMC-based SIMs could reach the market as much as 18 months before comparable USB-based handsets."

77.     On information and belief, other members of the SD Group were informed of and approved SanDisk's anticompetitive actions in ETSI.

**E.      The Effect of Defendants' Conduct on Competition and on Plaintiff's Business**

78.     The conspiracy between Defendants and the other members of the SD Group has achieved its anticompetitive objectives.  The efforts of SD Group members to leverage their combined weight in the marketplace, together with the steps they have taken to impede the emergence of competing MMC formats, have succeeded in making the SD Card and derivative form factors such as Mini SD and Micro SD the dominant format in the flash memory card market.  On information and belief, SD Cards (including Mini SD and Micros SD) accounted for more than 80 percent of all flash memory cards sold worldwide in 2009.

79.     The conspiracy between Defendants and the other members of the SD Group has also succeeded in reducing competition between different flash memory card formats.  In contrast to the profusion of new formats entering the market during the 1990s, no significant alternative to the SD Card format has been introduced since the SD Card was launched in 2000.  As described above, SD Group members have further reduced competition in flash memory cards by withdrawing their own pre-existing formats from the market and by actively impeding the emergence of competing new formats sponsored by the MMCA. Consumers have been harmed by the resulting diminution in choice between flash memory card formats.

80.     The individual members of the SD Group have benefited handsomely from their decision to abandon open standard-setting and to establish instead a Specification and industry association that they could dominate.  On information and belief, this anticompetitive conduct has allowed the SD Group to extract hundreds of millions of dollars in royalty flows each year from numerous competing flash card manufacturers.  This royalty burden has handicapped the ability of rival manufacturers to compete with SD Group members (who pay no royalties) in the sale of SD Cards.  As a result, Panasonic, SanDisk and Toshiba have been able collectively to dominate the SD Card product market, together accounting for approximately 65-

70 percent of the U.S. retail market (including cards manufactured by an SD Group member and sold by a third party under its own brand name). The SD Group's collective share of the total U.S. market for SD Cards, including both retail and sales to original equipment manufacturers such as Motorola, likely is greater than 70 percent. Consumers have paid higher prices for SD Cards than would have been the case if SD Group members had been required to compete on an even playing field with other manufacturers.

81.    Samsung has been harmed by the conduct of the SD Group and SD-3C. As a manufacturer of SD Cards, Samsung has been required to execute the SD Card License without any opportunity to renegotiate its discriminatory terms. Pursuant to the license, Samsung has been required to pay supracompetitive royalties to SD-3C, a significant proportion of which relate to purportedly unlicensed memory contained in SD Cards sold by Samsung. Moreover, the artificial exclusion of memory technology rights from the scope of the SD License has forced Samsung to enter into additional royalty-bearing license agreements covering such memory rights with each member of the SD Group, effectively amounting to a double royalty on SD Cards.

82.    The supracompetitive royalties imposed by the SD Group have impaired the ability of both Samsung and its customers for NAND flash memory chips to compete in the flash memory card market. As a result, Samsung has sold fewer flash memory cards than would have been the case absent defendants' anticompetitive conduct and has sold fewer NAND flash memory chips for incorporation into flash memory cards made by smaller manufacturers and assemblers.

## RELEVANT MARKETS

83.    There is a relevant antitrust market in the technology needed for or related to flash memory cards, consisting of technology developed for this end-use or that might be applied toward this end-use (the "Flash Memory Card Technology market").

84.    There is a separate relevant antitrust market in the sale of finished flash memory cards to third parties (the "Flash Memory Card market"). Such finished flash memory cards are broadly used in interstate commerce for a range of applications, including particularly

1  for data storage in digital cameras and other digital devices.

2  85.  There is a separate relevant antitrust market in the technology needed for or

3  related to SD Cards, consisting of technology developed for this end-use or that might be

4  applied toward this end-use (the "SD Card Technology market").

5  86.  There is a separate relevant antitrust market in the sale of finished SD

6  Cards to third parties (the "SD Card market").  Such finished SD Cards are broadly used in

7  interstate commerce for many of the same applications as flash memory cards generally.  SD

8  Cards are, however, the only type of flash memory card that can be used in the SD slots

9  included on many digital devices.

10  87.  In each case, the relevant geographic market is the United States and its

11  territories, or, alternatively, the world.

**CAUSES OF ACTION**

**CLAIM I**
**Agreement in Restraint of Trade in Violation of Section 1 of the Sherman**
**Act against Panasonic and SD-3C LLC**
**(in the Flash Memory Card Technology Market)**

16  88.  Plaintiff hereby incorporates by reference Paragraphs 1 through 87 of this

17  Complaint, as though fully set forth herein.

18  89.  Panasonic and SD-3C entered into a continuing contract, combination,

19  and/or conspiracy with the other members of the SD Group to unreasonably restrain trade and

20  commerce in the market for Flash Memory Card Technology.

21  90.  Panasonic, SanDisk and Toshiba were significant horizontal competitors in

22  the Flash Memory Card Technology market.  Prior to their agreement, the three companies

23  developed competing flash memory card technologies and reached independent decisions on

24  whether and at what price to license those technologies to other industry participants.  Following

25  their independent business judgment, each company supported open standard-setting initiatives

26  as a means of encouraging industry adoption of the flash memory card technologies they had

27  developed.

28  91.  In or around August 1999, Panasonic agreed with SanDisk and Toshiba to

- 23 -
COMPLAINT

limit competition with each other in the Flash Memory Card Technology market, to eliminate their separate flash card products, and to collaborate for the purpose of developing a secure version of the MultiMediaCard, to be known as the SD Card. To this end, Panasonic, the other members of the SD Group and SD-3C agreed to license their SD Card technologies exclusively through SD-3C and to do so at a single price. These agreements to restrain competition are ongoing and continuing.

92.    Panasonic's agreement with the other SD Group members and SD-3C has caused anticompetitive effects in the Flash Memory Card Technology market. Panasonic, SanDisk and Toshiba deliberately chose to jointly develop the SD Card outside the pre-existing open standard-setting framework for MultiMediaCard specifications in order to manipulate and control the associated technology. As a result, Panasonic, SanDisk and Toshiba are able, with SD-3C, to charge other industry participants supracompetitive royalties for flash memory card technology.

93.    The anticompetitive effects of the agreement between Panasonic, SD-3C and the other members of the SD Group are not offset by any countervailing benefits. Absent the agreement between the members of the SD Group, other industry participants were ready and willing to develop a flash memory card with substantially the same functionality of an SD Card. On information and belief, the agreement among Panasonic, SanDisk and Toshiba to jointly develop and jointly license flash memory card technology has not cleared blocking patent positions held by those companies. Rather, Panasonic has conspired with SanDisk and Toshiba to develop an SD Card specification that arbitrarily requires other manufacturers to practice patent rights owned by SD Group members and that would not otherwise be essential to implement the core functionality of an SD Card. Panasonic and SD-3C have further conspired with SanDisk and Toshiba to withhold comprehensive information on the essential patent rights covering SD Cards held by the SD Group that is necessary to permit licensees to assess the value of the rights conveyed by the SD Card License.

94.    The single, pooled license offered by SD-3C does not enhance licensing efficiency by eliminating the need for multiple licenses. On information and belief, the key

patent rights covering flash memory used in SD Memory Cards are claimed by the SD Group members. By its terms, however, the SD Card License excludes these rights, thereby requiring that companies that wish to manufacture SD Cards to seek separate licenses for flash memory technology from each of Panasonic, SanDisk and Toshiba.

95.   The unreasonable restraint of trade created by Defendants' agreement, and the effects thereof, continue. As a result of Defendants' agreement and acts in furtherance thereof, Samsung has suffered and will continue to suffer irreparable injury to its business and property.

96.   An actual, justiciable controversy appropriate for damages and declaratory relief exists among the parties.

**CLAIM II**
**Agreement in Restraint of Trade in Violation of Section 1 of the Sherman Act**
**against Panasonic**
**(in the Flash Memory Card Market)**

97.   Plaintiff hereby incorporates by reference Paragraphs 1 through 96 of this Complaint, as though fully set forth herein.

98.   Panasonic, SanDisk and Toshiba entered into a continuing contract, combination, agreement, and/or conspiracy to unreasonably restrain trade and commerce in the Flash Memory Card market.

99.   Panasonic has combined with SanDisk and Toshiba in the SD Group for the purpose of establishing the SD Card as the dominant flash memory card format. Pursuant to this agreement, Panasonic, SanDisk and Toshiba have acted to suppress competition for the SD Card from other types of flash memory card. At least one SD Group member has acted in violation of its MMCA obligations to impede the release of new MultiMediaCard formats that would compete with SD Cards. On information and belief, this conduct is known to and approved of by the other SD Group members. In addition, Panasonic and Toshiba have discontinued sales of SmartMedia and Mega Storage cards respectively, each of which competed with SD Cards. These agreements to restrain competition are ongoing and continuing.

100.   For the reasons set forth above, including in paragraphs 93-94, the anticompetitive effects of the agreement between Panasonic, SD-3C and the other members of the SD Group are not offset by any countervailing benefits.

101.   The unreasonable restraint of trade created by Defendants' agreement, and the effects thereof, continue.  As a result of Defendants' agreement and acts in furtherance thereof, Samsung has suffered and will continue to suffer irreparable injury to its business and property.

102.   An actual, justiciable controversy appropriate for damages and declaratory relief exists among the parties.

## CLAIM III
### Agreement in Restraint of Trade in Violation of Section 1 of the Sherman Act against Panasonic and SD-3C LLC (in the SD Card Technology Market)

103.   Plaintiff hereby incorporates by reference Paragraphs 1 through 102 of this Complaint, as though fully set forth herein.

104.   Panasonic, SD-3C and the other members of the SD Group entered into a continuing contract, combination, agreement, and/or conspiracy to unreasonably restrain trade and commerce in the SD Card Technology market.

105.   Panasonic conspired with SanDisk and Toshiba to manipulate the SD Card Specification by arbitrarily requiring the use of patent rights owned by SD Group members to implement non-central features of the card.  By this means, the SD Group has put itself in a position to demand supracompetitive royalties for the rights of SD Group members deemed essential for implementation of the Specification, and has agreed on a single price that all three SD Group members will charge for their technology related to SD Cards.  By the same means, the SD Group has foreclosed competition from alternative technologies that, absent the SD Group's manipulation of the SD Specification, could be used to implement aspects of that Specification.  In addition, Panasonic and SD-3C have agreed with the other members of the SD Group to include in the SD Card License a discriminatory grantback provision that has the purpose and effect of discouraging licensees from developing SD Card technologies that might

- 26 -

1    compete with the technologies owned by SD Group members. These agreements to restrain

2    competition are ongoing and continuing.

3          106.   For the reasons set forth above, including in paragraphs 93-94, the

4    anticompetitive effects of the agreement between Panasonic, SD-3C and the other members of

5    the SD Group are not offset by any countervailing benefits.

6          107.   The unreasonable restraint of trade created by Defendants' agreement, and

7    the effects thereof, continue. As a result of Defendants' agreement and acts in furtherance

8    thereof, Samsung has suffered and will continue to suffer irreparable injury to its business and

9    property.

10          108.   An actual, justiciable controversy appropriate for damages and declaratory

11    relief exists among the parties.

12
                                    **CLAIM IV**
13    **Agreement in Restraint of Trade in Violation of Section 1 of the Sherman**
                        **Act against Panasonic and SD-3C LLC**
14                            **(in the SD Card Market)**

15          109.   Plaintiff hereby incorporates by reference Paragraphs 1 through 108 of this

16    Complaint, as though fully set forth herein.

17          110.   Panasonic, SD-3C and the other members of the SD Group entered into a

18    continuing contract, combination, agreement, and/or conspiracy to unreasonably restrain trade

19    and commerce in the market for SD Cards.

20          111.   By agreeing to license their SD Card technologies exclusively through a

21    joint license and at a single price, Panasonic, the other members of the SD Group and SD-3C

22    have raised the costs of other manufacturers of SD Cards, thereby reducing competition in the

23    SD Card market. The SD Card License requires licensees to pay a royalty of 6 percent on net

24    sales of all SD Cards. On information and belief, however, the members of the SD Group have

25    agreed to cross-license their respective SD Card technologies to each other on a royalty-free

26    basis. The discriminatory royalty required by the SD Card License insulates SD Group

27    members from competition in the SD Card market by giving them a permanent cost advantage

28    over rival manufacturers. The adverse effect of this cost advantage on competition in the SD

1    Card market is exacerbated by the additional royalties that SD Group members separately

2    demand from competitors for licenses to their flash memory patents. As a result of their

3    strategy of raising the costs of rival manufacturers, the SD Group members have been able to

4    establish a dominant position in the SD Card market. These agreements to restrain competition

5    are ongoing and continuing.

6        112.  For the reasons set forth above, including in paragraphs 93-94, the

7    anticompetitive effects of the agreement between Panasonic, SD-3C and the other members of

8    the SD Group are not offset by any countervailing benefits.

9        113.  The unreasonable restraint of trade created by Defendants' agreement, and

10   the effects thereof, continue. As a result of Defendants' agreement and acts in furtherance

11   thereof, Samsung has suffered and will continue to suffer irreparable injury to its business and

12   property.

13       114.  An actual, justiciable controversy appropriate for damages and declaratory

14   relief exists among the parties.

### CLAIM V
### Monopolization in Violation of Section 2 of the Sherman Act
### against SD-3C LLC
### (SD Card Technology Market)

18       115.  Plaintiff hereby incorporates by reference Paragraphs 1 through 114 of this

19   Complaint, as though fully set forth herein.

20       116.  SD-3C holds monopoly power in the market for SD Card Technology.

21   SD-3C licenses substantially all of the purportedly essential patent claims covering SD Cards

22   under the Specification developed by the SD Group. On information and belief, other members

23   of the SDA have not identified any patent rights owned by them that are essential for

24   manufacture of SD Cards under the Specification.

25       117.  SD-3C engaged in exclusionary conduct in order to acquire and maintain

26   this monopoly power. It has collaborated in the manipulation of the Specification by the SD

27   Group, by representing patent rights owned by SD Group members as essential for

28   implementation of the Specification and collecting royalties on that basis. It has failed to

disclose fully all the patents owned by SD Group members that the SD Group and SD-3C claim

to be essential for implementation of the Specification. It has coerced industry participants into

taking an SD Card License that incorporates a discriminatory grant-back provision, requiring

licensees to give SD Group members royalty-free access to any essential patent claims the

licensees may themselves develop covering SD Cards. This grant-back provision has the

purpose and effect of depriving competitors of the incentive to develop competing SD Card

technologies.

118. Defendants' unlawful monopoly in the SD Card Technology market and

the effects thereof continue.

119. An actual, justiciable controversy appropriate for damages and declaratory

relief exists among the parties.

### CLAIM VI
### Conspiracy to Monopolize in Violation of Section 2 of the Sherman Act
### against Panasonic and SD-3C LLC
### (SD Card Technology Market)

120. Plaintiff hereby incorporates by reference Paragraphs 1 through 119 of this

Complaint, as though fully set forth herein.

121. Panasonic and SD-3C conspired with the other members of the SD Group

unlawfully to acquire monopoly power in the market for SD Card Technology, in violation of

Section 2 of the Sherman Act, 15 U.S.C. § 2. Defendants entered into this conspiracy with the

specific intent of obtaining by unlawful means a monopoly in this market.

122. Defendants have each committed one or more overt acts in furtherance of

the conspiracy to monopolize the SD Card Technology market. Panasonic has joined with

SanDisk and Toshiba to exclude and disadvantage rivals by, among other things, (1) agreeing on

a single product design and ceasing the development and sale of their competing flash memory

card formats; (2) manipulating the SD Specification to arbitrarily require the use of their own

patents and foreclose other potential competing formats; (3) agreeing to license their respective

patent rights related to SD Cards exclusively through SD-3C and the SD Card License; (4)

requiring users of SD Card Technology, other than themselves, to pay a supracompetitive

- 29 -
COMPLAINT

royalty under the SD Card License; and (5) imposing on licensees a discriminatory grantback provision that discourages the development of competing SD Card technologies. SD-3C has enforced the SD Group's anticompetitive licensing scheme, including its unequal licensing and grant-back provisions, in furtherance of the objectives of the conspiracy .

123. Panasonic and the SD Group's unlawful conspiracy to monopolize and the effects thereof continue.

124. An actual, justiciable controversy appropriate for damages and declaratory relief exists among the parties.

**CLAIM VII**
**Declaratory Judgment of Unenforceability for Patent Misuse**
**by Panasonic and SD-3C LLC**

125. Plaintiff hereby incorporates by reference Paragraphs 1 through 124 of this Complaint, as though fully set forth herein.

126. By its terms, the SD Card License offered by SD-3C on behalf of Panasonic and the other SD Group members does not grant rights to the flash memory technology needed to manufacture an SD Memory Card.

127. The SD Card License requires the payment of royalties calculated as a percentage of the total value of the SD Card, including the memory.

128. SD-3C offered the SD Card License to Samsung as a non-negotiable proposal, and used the leverage of its purported patent rights to coerce Samsung into accepting the license terms.

129. The price of SD Cards varies in proportion to the amount of flash memory they contain.

130. The SD Card License accordingly extracts a royalty based on non-licensed goods. A patentholder engages in patent misuse when it charges royalty on an unlicensed good or the unlicensed component of an a good. Accordingly, Panasonic's conduct constitutes unlawful patent misuse and renders the patents covered by the SD Card License unenforceable.

131. This patent misuse, and the effects thereof, continue.

1    132.  An actual, justiciable controversy appropriate for damages and declaratory

2    relief exists among the parties.

3                                    **CLAIM VIII**
     **Unfair Competition Under California Business and Professions Code Section 17200 et seq.**
4                                   **against Panasonic**

5    133.  Plaintiff hereby incorporates by reference Paragraphs 1 through 132 of this

6    Complaint, as though fully set forth herein.

7    134.  The acts and conduct of Panasonic as alleged above in this Complaint

8    constitute methods of unlawful, unfair, and/or fraudulent business practice as defined by

9    California Business & Professions Code Section 17200.

10   135.  Panasonic's acts and practices, as described above, amount to an unlawful

11   business act or practice under Section 17200 in at least the following respects.  Panasonic (1)

12   entered into a continuing contract, combination, and/or conspiracy to unreasonably restrain trade

13   and commerce; (2) manipulated the standard-setting process to raise costs to rivals and

14   significantly threaten or harm competition; (3) required non-negotiable and discriminatory

15   grantback requirements on SD Card licensees; and (4) thereby foreclosed the development of

16   other flash memory card technologies.

17                                     **CLAIM IX**
                                **Violation of the Cartwright Act,**
18       **California Business and Professions Code Section 16700 et seq.**
                                    **against Panasonic**
19

20   136.  Plaintiff hereby incorporates by reference Paragraphs 1 through 135 of this

21   Complaint, as though fully set forth herein.

22   137.  Panasonic has, through the acts and conduct described herein, entered into

23   an unlawful trust as defined by California Business & Professions Code Sections 16720 and

24   16726.

25   138.  Panasonic and the SD Group member entered into a combination with the

26   purpose of restraining competition by, among other things: (1) limiting or reducing the

27   production of and/or increasing the price of flash memory card technology, flash memory cards,

28   SD Card technology and SD Cards; (2) preventing competition in the sale of flash memory card

technology, flash memory cards, and SD Cards; and (3) fixing the price of SD Card technology;

139.  As a result of Panasonic's actions, trade and commerce have been restrained in the following markets: (1) the Flash Memory Card Technology Market; (2) the Flash Memory Card market; (3) the SD Card Technology Market; and (4) the SD Card Market.

140.  Plaintiff has been harmed by Panasonic's unlawful conduct, by being required to pay higher royalties for the production of SD Cards than it would have in a free and competitive market, and through foreclosure of its ability to sell SD Cards and components to its customers.

141.  Such effects are continuing and will continue until injunctive relief is granted.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff seeks the following relief:

1.  Pursuant to 28 U.S.C. § 2201, a declaration that Panasonic and SD-3C have unreasonably restrained trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

2.  Pursuant to 28 U.S.C. § 2201, a declaration that the SD Card License is an unreasonable restraint of trade that violates Section 1 of the Sherman Act, 15 U.S.C. § 1;

3.  Pursuant to 28 U.S.C. § 2201, a declaration that SD-3C has monopolized the market for SD Card Technology in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2;

4.  Pursuant to 28 U.S.C. § 2201, a declaration that Panasonic and SD-3C have engaged in a conspiracy to monopolize the Flash Memory Card Technology market and the SD Card Technology market in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2;

5.  Pursuant to 28 U.S.C. § 2201, a declaration that the royalty provision of the SD Card License constitutes patent misuse and that all patents covered by the license are unenforceable;

6.  Restitution of all sums paid as royalties by Samsung under the SD Card License since the execution thereof;

7.  Pursuant to 28 U.S.C. § 2202, such further relief as may be necessary or proper based upon the Court's declaratory judgment;

8.  Pursuant to 15 U.S.C. § 15, trebled damages resulting from Panasonic's and SD-3C's violations of the Sherman Act;

9.  Injunctive relief preventing and restraining Defendants from collecting royalties on SD Cards manufactured by third parties;

10. Pursuant to California Business & Professions Code Sections 16750 and 17203, restitution of royalties paid by Samsung under the SD Card License since the date of execution and an injunction to prevent Panasonic's continued acts of unfair competition;

11. Pre-judgment and post-judgment interest at the maximum legal rate;

12. Plaintiff's costs, expenses, and reasonable attorneys' fees in bringing this action; and

13. Such other relief as the Court may deem just and proper.


Dated: July 15, 2010                          COVINGTON & BURLING LLP


                                              By: _____
                                                     Simon J. Frankel
                                              Attorneys for Plaintiff
                                              SAMSUNG ELECTRONICS CO., LTD.

### DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury.


Dated: July 15, 2010                          COVINGTON & BURLING LLP


                                              By: _____
                                                     Simon J. Frankel
                                              Attorneys for Plaintiff
                                              SAMSUNG ELECTRONICS CO., LTD.