1   JEFFREY L. KESSLER (*pro hac vice*)
    jkessler@winston.com
2   ALDO A. BADINI (SBN 257086)
    abadini@winston.com
3   WINSTON & STRAWN LLP
    200 Park Avenue
4   New York, NY 10166
    Telephone: (212) 294-4601
5   Facsimile: (212) 294-4700

6   Attorneys for Defendants
    PANASONIC CORPORATION
7   PANASONIC CORPORATION OF NORTH AMERICA
    **[Additional Counsel Listed on Signature Page]**
8
    CHRISTOPHER B. HOCKETT (SBN 121539)
9   chris.hockett@davispolk.com
    DAVIS POLK & WARDWELL LLP
10  1600 El Camino Real
    Menlo Park, California  94025
11  Telephone:  (650) 752-2000
    Facsimile:   (650) 752-2111
12
    Attorneys for Defendant
13  SD-3C, LLC
    **[Additional Counsel Listed on Signature Page]**
14
                    UNITED STATES DISTRICT COURT
15
             FOR THE NORTHERN DISTRICT OF CALIFORNIA
16
                         OAKLAND DIVISION
17

18  SAMSUNG ELECTRONICS CO., LTD.,          )   Case No. 4:10-cv-03098-JSW
    a Korean corporation,                    )
19                                           )
                        Plaintiff,           )
20                                           )
            v.                               )
21                                           )   **DEFENDANTS' JOINT NOTICE OF**
                                             )   **MOTION AND MOTION TO DISMISS**
22  PANASONIC CORPORATION, a Japanese        )   **THE THIRD AMENDED COMPLAINT**
    corporation; PANASONIC CORPORATION       )
23  OF NORTH AMERICA, a Delaware             )   Date:       April 10, 2015
    corporation; and SD-3C, LLC, a Delaware  )   Time:       9:00 a.m.
24  limited liability company,               )   Courtroom:  Courtroom 5, 2nd Floor
                                             )   Judge:      The Hon. Jeffrey S. White
25                      Defendants.          )
                                             )
26

27

28

**NOTICE OF MOTION AND MOTION**

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE THAT on April 10, 2015, at 9:00 a.m., or as soon thereafter as this matter may be heard before the Honorable Jeffrey S. White, U.S. District Court Judge, Defendants Panasonic Corporation ("Panasonic"), Panasonic Corporation of North America ("PNA"), and SD-3C, LLC ("SD-3C") will and hereby do move this Court for an order dismissing the Third Amended Complaint ("TAC") filed by Plaintiff Samsung Electronics Co., Ltd. ("Samsung") on January 20, 2015, pursuant to Federal Rules of Civil Procedure 8(a) and 12(b)(6).

The motion is based on this Notice of Motion and Motion, the accompanying Memorandum of Points and Authorities in support thereof, the accompanying Request for Judicial Notice, and the Declaration of Susannah P. Torpey ("Torpey Decl."), filed herewith, as well as the TAC, oral argument of counsel, and such arguments and authorities as may be presented at or before the hearing.

# SUMMARY OF ARGUMENT

1.      The TAC challenges standard-setting and licensing behavior that has consistently been found to be procompetitive.  Indeed, the standard-setting in this case led to enormous advances in the break-through memory technology of Secure Digital Memory Cards ("SD Cards") that greatly benefited consumers.  While Samsung would like to avoid the royalties it agreed to pay SD-3C in order to practice essential SD Card patents and sell SD Cards, it has failed to allege any facts to support an actionable antitrust challenge under either federal or California law.

2.      Samsung pleads no facts showing that it suffered antitrust injury.  The Ninth Circuit held that Samsung's claims are based on Defendants' alleged efforts to enforce the 2006 SD Card License (otherwise, they would be time barred).  But Samsung admits it never signed that license.  Thus, Samsung could only have benefitted from the alleged enforcement of the 2006 License against its competitors.  In addition, Samsung's alleged injuries flow from procompetitive behavior that cannot give rise to antitrust injury.  Samsung admits that device manufacturers willingly adopted the SD Card format, in part because of compatibility with the competing MMC format, and that Samsung voluntarily chose to make SD Cards to satisfy its customers' demands.  And Samsung's injuries are based on an entirely speculative but-for world in which the link between Defendants' actions and Samsung's alleged losses is far too tenuous to confer antitrust standing.

3.      Samsung's inability to plead that the SD-3C patent pool prevented its members from offering individual licenses to the essential patents included in the pool (and the facts pled to the contrary) precludes its claim that any license constitutes an actionable restraint of trade.

4.      Samsung's challenges to the SD Group's standard-setting and licensing agreements also fail because they are based upon conduct that courts consistently deem procompetitive and thus insufficient to support an antitrust claim.  Samsung pleads no facts to support a plausible claim of price fixing or other unlawful conduct.

5.      Samsung's claims also fail because the relevant markets pled are internally contradictory, implausible, and unsupported by any allegations that the Defendants have market power.

6.      Finally, the TAC fails to plead facts sufficient either to support its state law claims or to implicate Defendant PNA.

# TABLE OF CONTENTS

**Page**

MEMORANDUM OF POINTS AND AUTHORITIES ................................................................1

STATEMENT OF FACTS ...........................................................................................................1

PROCEDURAL HISTORY..........................................................................................................2

ARGUMENT ................................................................................................................................3

I.    SAMSUNG'S COMPLAINT SHOULD BE DISMISSED FOR LACK OF
      ANTITRUST INJURY ............................................................................................3

II.   SAMSUNG CANNOT STATE A VIABLE ANTITRUST CLAIM
      BECAUSE IT CANNOT ALLEGE THAT THE SD-3C POOL LICENSE
      RESTRAINED INDIVIDUAL LICENSING ..........................................................9

      A.    The Alleged Agreements Expressly Allow Independent Licensing ...............9

      B.    Samsung Alleges No Facts Plausibly to Contradict the Contractual
            Freedom to Individually License the Essential Patents in the SD-
            3C Patent Pool.............................................................................................10

III.  SAMSUNG FAILS TO STATE AN ANTITRUST CLAIM AGAINST
      SD-3C'S PATENT-LICENSING PRACTICES OR THE SD CARD
      STANDARD-SETTING PROCESS .......................................................................12

      A.    Samsung Fails to State a Viable Price-Fixing Claim Based on the
            6% Royalty in the 2003 and 2006 License Agreements ...............................12

      B.    Samsung Fails to State a Viable "Price-Squeeze" Claim .............................14

      C.    Samsung Fails to State a Claim Based on Royalty-Free Cross-
            Licenses........................................................................................................15

      D.    Samsung Fails to State a Claim Based on Non-Exclusive
            Grantback Provisions ...................................................................................16

      E.    Samsung Fails to State a Claim Based on Standard-Setting..........................17

IV.   SAMSUNG FAILS ADEQUATELY TO PLEAD MARKET POWER IN
      ANY RELEVANT MARKET .................................................................................19

      A.    Samsung Fails to Allege that Defendants Had Market Power in the
            Implausible "SD Card Market" and the "Flash Memory Card
            Market" ........................................................................................................20

      B.    Samsung Fails Plausibly to Allege Monopoly Power in an
            Untenable "Technology Market" ..................................................................22

V.    SAMSUNG HAS NOT ALLEGED FACTS TO SUPPORT ANY STATE
      LAW CLAIM................................................................................................................23

VI.     SAMSUNG DOES NOT STATE ANY CLAIM AGAINST PNA ...........................25

CONCLUSION ................................................................................................................25

1

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**CASES**

*Akanthos Capital Mgmt., LLC v. Atlanticus Holdings Corp.*,
   734 F.3d 1269 (11th Cir. 2013) ................................................................................. 9

*Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp.*,
   592 F.3d 991 (9th Cir. 2010) .................................................................................... 18

*Allied Tube & Conduit Corp. v. Indian Head, Inc.*,
   486 U.S. 492 (1988) ................................................................................................ 12

*Aryeh v. Canon Bus. Solutions, Inc.*,
   55 Cal. 4th 1185 (2013) ........................................................................................... 23

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ................................................................................................ 18

*Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*,
   459 U.S. 519 (1983) .................................................................................................. 8

*AXIS S.p.A. v. Micafil, Inc.*,
   870 F.2d 1105 (6th Cir. 1989) ................................................................................. 7

*Ball Mem'l Hosp., Inc. v. Mut. Hosp. Ins., Inc.*,
   784 F.2d 1325 (7th Cir. 1986) ................................................................................. 7

*Beckway v. DeShong*,
   No. C07-5072 TEH, 2010 WL 3768375 (N.D. Cal. Sept. 22, 2010) ..................... 25

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ................................................................................................ 21

*Blue Cross & Blue Shield United v. Marshfield Clinic*,
   65 F.3d 1406 (7th Cir. 1995) ................................................................................... 7

*Bos. Scientific Corp. v. Schneider (Eur.) AG*,
   983 F. Supp. 245 (D. Mass. 1997) .......................................................................... 13

*Brulotte v. Thys Co.*,
   379 U.S. 29 (1964) .................................................................................................. 14

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
   429 U.S. 477 (1977) ................................................................................................. 7

*Brunswick Corp. v. Riegel Textile Corp.*,
   752 F.2d 261 (7th Cir. 1984) ................................................................................... 7

*Carpet Seaming Tape Licensing Corp. v. Best Seam Inc.*,
   616 F.2d 1133 (9th Cir. 1980) ................................................................ 13

*CBC Cos. v. Equifax, Inc.*,
   561 F.3d 569 (6th Cir. 2009) .................................................................... 7

*Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*,
   20 Cal. 4th 163 (1999) ............................................................................ 24

*ChriMar Sys., Inc. v. Cisco Sys., Inc.*,
   No. C 13-01300 JSW, 2014 WL 5477666 (N.D. Cal. Oct. 29, 2014) ........................ 22, 23, 24

*City of Pittsburgh v. W. Penn Power Co.*,
   147 F.3d 256 (3d Cir. 1998) ...................................................................... 7

*Clamp-All Corp. v. Cast Iron Soil Pipe Inst.*,
   851 F.2d 478 (1st Cir. 1988) .................................................................... 18

*Columbia Broad. Sys., Inc. v. Am. Soc'y of Composers*,
   620 F.2d 930 (2d Cir. 1980) ................................................................. 9, 11

*Corwin v. L.A. Newspaper Serv. Bureau, Inc.*,
   4 Cal. 3d 842 (1971) ............................................................................... 23

*DM Research, Inc. v. Coll. of Am. Pathologists*,
   170 F.3d 53 (1st Cir. 1999) ..................................................................... 17

*Eastman Kodak Co. v. Image Technical Servs.*,
   504 U.S. 451 (1992) ........................................................................... 20, 21

*F. Hoffmann-La Roche Ltd. v. Empagran S.A.*,
   542 U.S. 155 (2004) ................................................................................. 6

*Flintkote Co. v. Lysfjord*,
   246 F.2d 368 (9th Cir. 1957) ................................................................... 16

*Gens v. Wachovia Mortg. Corp.*,
   No. 10-CV-01073, 2011 WL 1791601 (N.D. Cal. May 10, 2011) .......................... 6

*Golden Bridge Tech., Inc. v. Motorola, Inc.*,
   547 F.3d 266 (5th Cir. 2008) ............................................................. 17, 19

*Hynix Semiconductor Inc. v. Rambus Inc.*,
   No. CV-00-20905 RMW, 2008 WL 73689 (N.D. Cal. Jan. 5, 2008) ...................... 22

*Ice Cream Distribs. of Evansville, LLC v. Dreyer's Grand Ice Cream, Inc.*,
   2010 WL 3619884 (N.D. Cal. Sept. 10, 2010),
   *aff'd*, 487 F. App'x 362 (9th Cir. 2012) ................................................. 24

*Ice Cream Distribs. of Evansville, LLC v. Dreyer's Grand Ice Cream, Inc.*,
  No. 09-5815 CW, 2010 WL 2198200 (N.D. Cal. May 28, 2010) ........................................ 24

*Ill. Tool Works Inc. v. Indep. Ink, Inc.*,
  547 U.S. 28 (2005) ........................................................................................................ 23

*In re Lithium Ion Batteries Antitrust Litig.*,
  No. 13-MD-2420 YGR, 2014 WL 309192 (N.D. Cal. Jan. 21, 2014) ................................ 25

*In re Optical Disk Drive Antitrust Litig.*,
  No. 3:10 MD-02143-RS, 2011 WL 3894376 (N.D. Cal. Aug. 3, 2011) .............................. 25

*In re TFT-LCD Antitrust Litig.*,
  586 F. Supp. 2d 1109 (N.D. Cal. 2008) ........................................................................ 11

*In re WebKinz Antitrust Litig.*,
  695 F. Supp. 2d 987 (N.D. Cal. 2010) ...................................................................... 5, 6

*Int'l Mfg. Co. v. Landon, Inc.*,
  336 F.2d 723 (9th Cir. 1964) ...................................................................................... 13

*Int'l Norcent Tech. v. Koninklijke Philips Elecs. N.V.*,
  2007 WL 4976364 (C.D. Cal. Oct. 29, 2007) .......................................................... passim

*Kaui Scuba Ctr., Inc. v. PADI Am., Inc.*,
  No. 10-1579, 2011 WL 2711177 (C.D. Cal. July 13, 2011) ............................................ 6

*Kendall v. Visa U.S.A., Inc.*,
  518 F.3d 1042 (9th Cir. 2008) ............................................................................ 19, 25

*Kloth v. Microsoft Corp.*,
  444 F.3d 312 (4th Cir. 2006) ................................................................................ 8, 16

*Knievel v. ESPN*,
  393 F.3d 1068 (9th Cir. 2005) .................................................................................... 9

*Koninklijke Philips N.V. v. Cinram Int'l, Inc.*,
  2013 WL 2301955 (S.D.N.Y. May 24, 2013) .............................................................. 14

*Los Gatos Mercantile, Inc. v. E.I. DuPont de Nemours & Co.*,
  No. 13-cv-01180-BLF, 2014 WL 4774611 (N.D. Cal. Sept. 22, 2014) .............................. 24

*Matsushita Elec. Indus. Co. v. Cinram Int'l, Inc.*,
  299 F. Supp. 2d 370 (D. Del. 2004) ...................................................................... 10, 15

*Medina v. Microsoft Corp.*,
  No. C14-1043 RS, 2014 WL 4243992 (N.D. Cal. Aug. 26, 2014) ................................ 24, 25

*Minebea Co. v. Papst*,
  444 F. Supp. 2d 68 (D.D.C. 2006) .............................................................................. 23

*Morris Commc'ns Corp. v. PGA Tour, Inc.*,
　　364 F.3d 1288 (11th Cir. 2004) ................................................................. 14

*Nero AG v. MPEG LA, L.L.C.* (*Nero I*),
　　No. 10-cv-3672, 2010 WL 4366448 (C.D. Cal. Sept. 14, 2010) ............................... 9

*Nero AG v. MPEG LA, L.L.C.* (*Nero II*),
　　No. 10-cv-3672-MRP-RZ, 2010 WL 4878835 (C.D. Cal. Nov. 24, 2010) ................. 7, 11, 18

*Newcal Indus. v. Ikon Office Solution*,
　　513 F.3d 1038 (9th Cir. 2008) ............................................................ 20, 23

*Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*,
　　555 U.S. 438 (2009) ......................................................................... 14

*PNY Techs., Inc. v. SanDisk Corp*,
　　No. C-11-04689YGR, 2012 WL 1380271 (N.D. Cal. Apr. 20, 2012) ............................ 7, 17

*Pool Water Prods. v. Olin Corp.*,
　　258 F.3d 1024 (9th Cir. 2001) ............................................................... 5

*Princo Corp. v. ITC*,
　　616 F.3d 1318 (Fed. Cir. 2010) ............................................................. 17

*Queen City Pizza, Inc. v. Domino's Pizza Inc.*,
　　124 F.3d 430 (3d Cir. 1997) ................................................................ 21

*Rebel Oil Co. v. Atl. Richfield Co.*,
　　51 F.3d 1421 (9th Cir. 1995) ............................................................... 23

*Rheumatology Diagnostics Lab., Inc. v. Aetna, Inc.*,
　　No. 12-cv-05847-WHO, 2014 WL 524076 (N.D. Cal. Feb. 6, 2014) ............................. 24

*Rick-Mik Enters. v. Equilon Enters.*,
　　532 F.3d 963 (9th Cir. 2008) ............................................................... 20

*Samsung Elecs. Co. v. Panasonic Corp.*,
　　747 F.3d 1199 (9th Cir. 2014) ............................................................ 2, 3

*Santa Fe-Pomeroy, Inc. v. P & Z Co.*,
　　569 F.2d 1084 (9th Cir. 1978) .............................................................. 16

*SCFC ILC, Inc. v. Visa USA, Inc.*,
　　36 F.3d 958 (10th Cir. 1994) ............................................................... 19

*Schachar v. Am. Acad. of Ophthalmology, Inc.*,
　　870 F.2d 397 (7th Cir. 1989) ............................................................... 17

*Solis v. City of Fresno*,
　　No. 1:11-CV-00053, 2012 WL 868681 (E.D. Cal. Mar. 13, 2012) .............................. 21

*Somers v. Apple, Inc.*,
  729 F.3d 953 (9th Cir. 2013) ............................................................ 4, 6

*Spindler v. Johnson & Johnson Corp.*,
  No. C 10-01414 JSW, 2011 WL 12557884 (N.D. Cal. Aug. 1, 2011) ................................ 21

*Sprewell v. Golden State Warriors*,
  266 F.3d 979 (9th Cir. 2001) ............................................................. 10

*Standard Oil Co. v. United States*,
  283 U.S. 163 (1961) ..................................................................... 13, 15

*Standfacts Credit Servs., Inc. v. Experian Info. Solutions, Inc.*,
  405 F. Supp. 2d 1141 (C.D. Cal. 2005) ...................................................... 24

*Sumitomo Mitsubishi Silicon Corp. v. MEMC Elec. Materials, Inc.*,
  No. 05-2133, 2007 WL 2318903 (N.D. Cal. Aug. 13, 2007) ........................................ passim

*Tanaka v. Univ. of S. Cal.*,
  252 F.3d 1059 (9th Cir. 2001) ........................................................ 13, 14, 20

*Tessera, Inc. v. Micron Tech., Inc.*,
  No. 2:05CV94, 2005 WL 1661106 (E.D. Tex. July 14, 2005) ..................................... 23

*Texaco Inc. v. Dagher*,
  547 U.S. 1 (2006) ....................................................................... 12

*Town of Concord v. Bos. Edison Co.*,
  915 F.2d 17 (1st Cir. 1990) .............................................................. 14

*U.S. Healthcare, Inc. v. Healthsource, Inc.*,
  986 F.2d 589 (1st Cir. 1993) ............................................................. 13

*U.S. Philips Corp. v. ITC*,
  424 F.3d 1179 (Fed. Cir. 2005) ..................................................... 12, 14, 15

*Union Cosmetic Castle, Inc. v. Amorepacific Cosmetics USA, Inc.*,
  454 F. Supp. 2d 62 (E.D.N.Y. 2006) ....................................................... 7

*Verizon Commc'ns, Inc. v. Law Offices of Curtis V. Trinko, L.L.P.*,
  540 U.S. 398 (2004) ...................................................................... 7

*Wuxi Multimedia, Ltd. v. Koninklijke Philips Elecs., N.V.*,
  No. 4cv1136, 2006 WL 6667002 (S.D. Cal. Jan. 5, 2006)
  *aff'd*, 280 F. App'x 968 (Fed. Cir. 2008) ......................................... 10, 13, 14, 15

**STATUTES**

15 U.S.C. § 6a ............................................................................. 6

Cal. Bus. & Prof. Code § 17200 ............................................................................. 3, 24, 25

**OTHER AUTHORITIES**

1 Hovenkamp et al., *IP and Antitrust* § 25.2 (2d ed. Supp. 2013) .......................... 16, 17

2 Hovenkamp et al., *IP and Antitrust* § 35.3 (2d ed. Supp. 2014) ................................ 19

13 Hovenkamp, *Antitrust Law* ¶ 2233 (3d ed. 2012) .............................................. 18, 19

DOJ, *Antitrust Guidelines for Int'l Operations* 42 (1988) ........................................... 19

DOJ & FTC, *Antitrust Guidelines for the Licensing of Intellectual Property* (1995) ........... 17, 22

Letter from DOJ to Carey R. Ramos, Esq., Paul, Weiss, Rifkind, Wharton & Garrison (June 10, 1999), 1999 WL 392163 ..................................................................... 17

## MEMORANDUM OF POINTS AND AUTHORITIES

### STATEMENT OF FACTS

Samsung's TAC seeks to challenge standard-setting and licensing activities that resulted in a 2003 license agreement between Samsung and SD-3C and royalty-free cross-licenses among the SD Group.  *See* TAC ¶¶ 3, 5, 10, 122, 154; Order Granting Mot. to Dismiss the Second Am. Compl. ("Order"), at 1-2 (ECF No. 119).  SD-3C licenses patents and other intellectual property essential to practicing the SD Card Specification (the "Specification") developed by Panasonic, SanDisk Corporation, and Toshiba Corporation (the "SD Group") in 1999 and released in 2000. TAC ¶¶ 10, 51, 52, 60, 77; Order at 1-2.  The Specification incorporated "additional functionality," including "'advanced security and copyright protection features' not found in prior flash memory card formats."  Order at 2; *see* TAC ¶¶ 52-53.

The SD Group subsequently formed an open membership body called the SD Association to promote and revise the Specification, and created SD-3C to provide patent pool licenses to essential SD Card technology.  *See* TAC ¶¶ 67, 77.  Companies like Samsung that wished to make SD Cards could both join the SD Association and enter into an SD Card License with SD-3C.  *See id.* Samsung joined the SD Association as an Executive Member before the association's announcement in January 2000 and was thus able to participate in "set[ting] industry standards for [SD Cards]" and in "establish[ing] technical and specification standards for the SD Memory Card applications."  Torpey Decl. Ex. 1; *see* Defs.' Req. for Judicial Notice.

Under the terms of the SD Card License, members of the SD Group remained free to individually license their essential SD Card patents as an alternative to the patent pool license.  *See* Torpey Decl. Ex. 2 (2006 License, at 1, § 12.5); *see also id.* Ex. 3 (Second Amended and Restated SD Master Licensing Agreement, at 2, 8).  In fact, Samsung has concluded individual negotiations with both SanDisk and Toshiba, resulting in both companies "substantially modifying their license agreements with Samsung" regarding SD Cards.  *See* Torpey Decl. Ex. 4; TAC ¶ 136.

Although the SD Card began as a new product with no market share, and notwithstanding "stiff" competition from other memory card formats, by late 2006, it had "become the dominant flash memory card format in use in the United States and worldwide."  TAC ¶¶ 2, 45-48.  The SD

1  Group promoted the SD Card format by offering device manufacturers "royalty-free licenses to

2  incorporate SD Card functionality into their products … and by promising to make SD Cards

3  backwardly compatible with the [competing] MMC format."  TAC ¶ 75; *see* Order at 2.

4      In 2003, Samsung entered into an SD Card License with SD-3C.  TAC ¶¶ 5, 120-24.

5  Specifications for two second-generation SD Cards, the microSD Card and the high capacity SD

6  Card ("SDHC"), were adopted by the SD Association in 2005 and 2006, respectively.  *See* TAC

7  ¶¶ 94, 96.  Development of the second-generation SD Cards again occurred in the face of

8  competition from other memory card formats.  *See, e.g.*, TAC ¶ 95.  In 2006, SD-3C offered an

9  amendment to the 2003 SD Card License that expressly covered second-generation cards ("2006

10  License"), but Samsung declined to sign it.  *See, e.g.*, TAC ¶ 109.  Instead, Samsung chose to pay

11  royalties for second-generation SD Cards pursuant to the terms of its 2003 SD Card License.  *See*

12  TAC ¶¶ 109, 123; Order at 4-6.[1]  Samsung alleges that it "transitioned to manufacturing SD Cards,"

13  thereby ceasing to take orders for the competing MMC flash memory format (for which Samsung

14  paid no royalties), as a result of demands from its "more important customers."  TAC ¶¶ 46, 78, 97,

15  100-101; *see also Samsung Elecs. Co. v. Panasonic Corp.*, 747 F.3d 1199, 1203-05 (9th Cir. 2014)

16  (Samsung began paying SD Card royalties because "SD Cards proved more popular than

17  Samsung's alternative flash memory [MMC] format.").

18  **PROCEDURAL HISTORY**

19      Samsung filed its Complaint on July 15, 2010.  ECF No. 1.  On September 24, 2010,

20  Defendants filed their Joint Motion to Dismiss the Complaint.  ECF No. 63.  One day prior,

21  Defendants Panasonic Corporation and PNA served Samsung with a Rule 11 Letter and draft

22  Motion for Sanctions, *see* Torpey Decl. ¶ 2, asserting that Samsung's allegation that the SD Group

23  agreed "to license their SD Card *patents* exclusively through SD-3C and at a single price," Compl.

24  ¶ 64 (emphasis added), was false and known by Samsung to be false.

25

26

_____

27  [1] Samsung alleges that its 2003 License was implicitly amended to cover second-generation cards, TAC ¶ 115, and concedes that it never agreed to any SD Card License other than the 2003 SD Card License, TAC ¶¶ 109, 122, 123.

28

1    In response, Samsung filed its First Amended Complaint, ECF No. 74 ("FAC"), which

2    replaced the allegation of an agreement by SD Group members to license exclusively through SD-

3    3C with the conclusory allegation that SD Group members "provide no alternative to the SD Card

4    License" and thus "effectuate" an alleged agreement to "jointly license their SD Card *technologies*,

5    exclusively through SD-3C at a single price." FAC ¶ 64 (emphasis added). Samsung, however,

6    now concedes the availability of individual SD Card licenses. *See* TAC ¶ 82.

7    The Court granted Defendants' motion to dismiss the FAC. The Court held that Samsung's

8    Sherman Act and Cartwright Act claims were time barred. The Court also dismissed Samsung's

9    antitrust claims based on the 2006 License on the grounds that: (1) Samsung "did not sign the

10   [2006 License] and, according to its own theory of liability, stood to profit from the further

11   restriction of competition to competitors in the same field;" and (2) Samsung's claimed injury as a

12   supplier of SD Card components was "too attenuated, indirect and remote to constitute a cognizable

13   antitrust injury." ECF No. 104, at 3-7. Finally, the Court dismissed Samsung's claim under the

14   "unlawful" prong of California Business & Professions Code § 17200, as well as its patent misuse

15   claim (the latter with prejudice). *Id.* at 8-10.

16   On September 16, 2011, Samsung filed its Second Amended Complaint ("SAC"), ECF No.

17   105, which the Court again dismissed as time barred, without addressing other grounds for

18   dismissal. Order at 4-7. On April 4, 2014, the Ninth Circuit reversed the dismissal of the SAC on

19   statute of limitations grounds, and remanded the case for further proceedings. ECF No. 126. The

20   Ninth Circuit based its reversal on Samsung's challenge to Defendants' alleged efforts to enforce

21   the 2006 License. *Samsung Elecs.*, 747 F.3d at 1203-04. On January 20, 2015, Samsung filed its

22   TAC. ECF No. 148.

**ARGUMENT**

23

24   I.    **SAMSUNG'S COMPLAINT SHOULD BE DISMISSED FOR LACK OF ANTITRUST INJURY**

25

26   To demonstrate "antitrust injury," a plaintiff must allege: "(1) unlawful conduct, (2) causing

27   an injury to the plaintiff, (3) that flows from that which makes the conduct unlawful, and (4) that is

28

of the type the antitrust laws were intended to prevent." *Somers v. Apple, Inc.*, 729 F.3d 953, 963 (9th Cir. 2013) (citations omitted).  The TAC falls well short of meeting these requirements.

*First, "[t]here can be no antitrust injury" where, as here, "the plaintiff stands to gain from the alleged unlawful conduct." Id.*  Samsung argued to the Ninth Circuit, and the Ninth Circuit agreed, that reversal of this Court's statute of limitations ruling was appropriate because Samsung's claims are based on Defendants' alleged efforts to enforce the 2006 License.  According to Samsung, since achieving a "dominant position" in 2006, "the SD Group have sought to impose [via the 2006 License] increasingly onerous and anticompetitive terms on potential licensees." TAC ¶¶ 2, 76, 92, 169.  But Samsung admits that it never signed the 2006 License, TAC ¶ 119, and thus to the extent anything in the 2006 License constituted "increasingly onerous" terms relative to the 2003 License that Samsung did sign, Samsung would have *benefitted* from the purportedly more onerous terms imposed only on its competitors.  As this Court previously explained, because Samsung did not sign the 2006 License, "according to its own theory of liability, [Samsung] stood to profit from [that agreement's alleged] further restriction of competition to competitors in the same field."  ECF No. 104 at 6 (citation omitted).  This flaw alone compels dismissal of the TAC.

*Second, Samsung fails plausibly to allege that any of its purported injuries flowed from any unlawful or anticompetitive conduct by Defendants.*  To the contrary, the TAC makes clear that any injuries Samsung allegedly suffered flow from Defendants' legal, competition-*enhancing* conduct — *i.e.*, the introduction and promotion of new SD Card formats that Samsung's customers preferred over other memory card formats.  Samsung's purported injuries also flow from its *own* admitted and subsequent strategic decision to stop taking orders for MMC cards to meet its customers' demands.  *See* TAC ¶ 46.

Samsung's causation theory boils down to the assertion that the SD Group "coerce[d] other industry participants into paying [a] royalty" to make SD Cards.  TAC ¶ 4.  According to Samsung, this "coercion" stemmed from the fact that the SD Group "induced competitors [such as manufacturers of cameras and cell phones] to adopt their format by offering them royalty-free licenses to incorporate SD Card functionality into their products … and by promising to make SD

1  Cards backwardly compatible with the MMC format."  TAC ¶ 75.  In other words, Samsung is

2  complaining that the SD Group successfully competed with the MMC format by offering

3  manufacturers of host devices licenses on the same price terms (*i.e.*, royalty-free) as existed for

4  MMC technology, while maintaining interoperability with *competing* MMC cards, thereby

5  encouraging the widespread adoption of the SD Card format in host devices, which, in turn, created

6  demand for SD Cards.[2]  This is competition on the merits, not "coercion."  Indeed, offering royalty-

7  free licenses to host manufacturers and maintaining interoperability with MMC cards was

8  *procompetitive*, and thus cannot support any finding of antitrust injury.  *See Pool Water Prods. v.*

9  *Olin Corp.*, 258 F.3d 1024, 1034 (9th Cir. 2001) (where, as here, "the injury flows from aspects of

10  the defendant's conduct that are beneficial or neutral to competition, there is no antitrust injury").

11      Nor can Samsung rescue its allegation of "coercion" with unsupported assertions that the

12  SD Group "agree[d] to jointly replace" the MMC card and "avoid[ed] competing with the SD Card

13  format or technology."  TAC ¶¶ 15, 83, 194.[3]  Again, the *facts* pled are directly to the contrary.

14  Samsung concedes that new MMC formats, as well as other competing flash memory products,

15  continued to be released long after the SD Group purportedly agreed to replace the MMC format.

16  TAC ¶ 95 (alleging that MMCA released MMCmicro in 2005; "Sony released a small form factor

17  version of its proprietary format, the Memory Stick Micro," in 2006; and "the MMCA added a

18  small form-factor card," RS-MMC, in 2007).  And Samsung also admits that SD Group members

19  *continued competing against the SD Card format*, including in 2006, when SanDisk agreed to

20  license its patents to a "SIM card standard based on USB" on fair, reasonable, and non-

21  discriminatory terms, thus permitting the European Telecommunications Standards Institute (ETSI)

22  to adopt this competing standard.  TAC ¶ 84.[4]  Samsung's theory of injury is "implausible in the

23

24  ---
[2] While memory card manufacturers could continue making MMC cards that would fit in SD Card
slots, those, like Samsung, wishing to make SD Cards (as opposed to host devices) were required to

25  pay royalties on the SD Group's intellectual property.  *See* TAC ¶¶ 75, 117.
[3] *In re WebKinz Antitrust Litig.*, 695 F. Supp. 2d 987, 997 (N.D. Cal. 2010) (White, J.)

26  ("Conclusory allegations of anticompetitive effects are insufficient without supporting facts as to
how competition in the market has actually been reduced or harmed.").

27  [4] SanDisk's alleged European conduct is not anticompetitive and could not support a U.S. claim in
any event because Samsung does not allege that such conduct had a "direct, substantial, and

28  reasonably foreseeable effect" on U.S. commerce as required by the Foreign Trade Antitrust

face of contradictory market facts alleged in [its] complaint." *Somers*, 729 F.3d at 964 (affirming dismissal for lack of antitrust injury). Such "internally inconsistent, conclusory, and insufficient" allegations cannot survive a motion to dismiss. *Gens v. Wachovia Mortg. Corp.*, No. 10-CV-01073, 2011 WL 1791601, at *5 (N.D. Cal. May 10, 2011).[5]

When the facts alleged by Samsung (as opposed to its unsupported and contradictory characterizations of those facts) are considered, it becomes clear that by 2007 user demand had "tipped decisively in favor of SD Cards," not because of any coercive, unlawful, or anticompetitive conduct by the SD Group, but rather because memory card users preferred the SD Card format. For example, Nokia "designed its new mobile handsets exclusively around the smaller form factor SD Cards" from 2006 onwards, and "[o]ther mobile handset manufacturers followed suit." TAC ¶ 97. As Samsung admits, even its decision to stop making MMC cards was not forced on upon it by the SD Group, but was rather a unilateral business decision based on the preference of its customers (including Nokia) for SD Cards. TAC ¶¶ 46, 100 ("Samsung ceased taking orders for MMC cards in 2006 when it transitioned to manufacturing SD Cards" because "some of Samsung's more important customers requested that it supply them with SD Cards.").

That numerous host device manufacturers opted for the SD Card format as the most desirable flash memory solution does not reflect a reduction in competition, but rather a procompetitive benefit to consumers. As Samsung admits, "consumers value the convenience of being able to use the same flash memory card format in different host devices." TAC ¶ 38. The TAC's recognition that the success of the SD Card format flowed from marketplace demand for a preferred product, and Samsung's voluntary business decision to fulfill that demand by making SD Cards, compels dismissal for failure adequately to plead antitrust injury. *See Webkinz*, 695 F. Supp. 2d at 997 (no antitrust injury where the "expenditure is the result not of foreclosed business opportunities …, but from Plaintiffs' efforts to maximize their profits … by satisfying consumer

---

Improvements Act. 15 U.S.C. § 6a; *see F. Hoffmann-La Roche Ltd. v. Empagran S.A.*, 542 U.S. 155, 162 (2004).

[5] *See also Kaui Scuba Ctr., Inc. v. PADI Am., Inc.*, No. 10-1579, 2011 WL 2711177, at *5 n.5 (C.D. Cal. July 13, 2011) (dismissing complaint with "internal inconsistencies" because "contradictory allegations cannot stand").

demand"); *see also* TAC ¶ 123 (admitting Samsung voluntarily decided to renew its 2003 License in 2006).[6]

For these same reasons, Samsung "cannot rely upon its performance of the terms of [the 2003 or 2006 Licenses] to establish causal antitrust injury" "[b]ecause [Samsung] has not adequately pled that it entered into the unfavorable license with [SD-3C] as a result of anticompetitive conduct, or how exactly it has suffered antitrust injury based on the terms of the contract." *PNY Techs.*, 2012 WL 1380271, at *13. Samsung complains that it is paying a 6% royalty under the terms of the 2003 Agreement. But the antitrust laws do not afford a plaintiff a cause of action because it does not like the price it has to pay to compete[7] or the commercial terms to which it agreed for such an opportunity, absent a showing of anticompetitive effects and injury.[8] Indeed, "even where a business carries a significant portion of the market share, antitrust law is not a negotiating tool for a plaintiff seeking better contract terms." *CBC Cos., Inc.*, 561 F.3d at 573 (citing *Verizon Commc'ns, Inc. v. Law Offices of Curtis V. Trinko, L.L.P.*, 540 U.S. 398, 408 (2004)).

---

[6] If anything, Samsung's purported injuries — its royalty payments — flow from the enforcement of concededly valid patents that do not cause antitrust injury. TAC ¶¶ 10, 94; *see, e.g.*, *AXIS S.p.A. v. Micafil, Inc.*, 870 F.2d 1105, 1110-11 (6th Cir. 1989) (no antitrust injury where alleged injuries flow from competitors' patents) (following *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977)); *Brunswick Corp. v. Riegel Textile Corp.*, 752 F.2d 261, 266-67 (7th Cir. 1984) (Posner, J.) (no antitrust injury from enforcement of a valid patent); *PNY Techs., Inc. v. SanDisk Corp*, No. C-11-04689YGR, 2012 WL 1380271, at *13 (N.D. Cal. Apr. 20, 2012) (no antitrust injury where the "'injury' alleged … arises out of the payment of royalties to practice SanDisk's patents").

[7] *See Blue Cross & Blue Shield United v. Marshfield Clinic*, 65 F.3d 1406, 1413 (7th Cir. 1995); *see also CBC Cos. v. Equifax, Inc*., 561 F.3d 569, 572-73 (6th Cir. 2009) (affirming dismissal of antitrust claims where "the facts alleged in plaintiff's complaint suggests that [plaintiff's] fundamental frustration is with the price terms of [the agreement it entered], rather than specific anticompetitive behavior"); *Ball Mem'l Hosp., Inc. v. Mut. Hosp. Ins., Inc.*, 784 F.2d 1325, 1340 (7th Cir. 1986) (district courts should not "become little versions of the Office of Price Administration and assess the 'cost justification' for prices charged").

[8] *PNY Techs.*, 2012 WL 1380271, at *13 (no antitrust injury where alleged harm flows from terms of license agreement to which plaintiff voluntarily agreed); *Nero AG v. MPEG LA, L.L.C.* (*Nero II*), No. 10-cv-3672-MRP-RZ, 2010 WL 4878835, at *4 (C.D. Cal. Nov. 24, 2010) (a plaintiff "cannot plausibly allege it was coerced into signing [a patent pool license] when it … chose to enter into a new agreement"); *Union Cosmetic Castle, Inc. v. Amorepacific Cosmetics USA, Inc.*, 454 F. Supp. 2d 62, 71 (E.D.N.Y. 2006) (no standing where "the injury … appears to be largely the result of [plaintiffs'] own business decisions").

1          ***Third, the "injury" Samsung claims "is simply too speculative to permit relief under the***

2    ***antitrust laws."***  *City of Pittsburgh v. W. Penn Power Co.*, 147 F.3d 256, 269 (3d Cir. 1998).

3    Samsung alleges that if the SD Group "had chosen to proceed within the MMCA, their standard-

4    setting activity would have been subject to the MMCA Policies," including "their policy preference

5    for technologies that can be licensed royalty free or on reasonable terms," suggesting that as a

6    result, Samsung and other manufacturers of flash memory would not have been subject to the

7    royalty provisions of the 2003 and 2006 License.  TAC ¶¶ 56, 58.  This means that Samsung's

8    claimed injuries depend entirely on the unfounded speculation that, absent the creation of the SD

9    Card format: (i) the MMCA would have succeeded in creating a new and prevailing industry

10   standard for memory cards; (ii) such standard would be based on patents that companies would

11   agree to license royalty-free, rather than for a "reasonable" royalty, which was contemplated by the

12   MMCA's "policy preference;" (iii) the MMCA would have considered the 6% royalty (charged by

13   SD-3C) to be "unreasonably" high; and (iv) the new standard promulgated by the MMCA would

14   have remained the dominant standard for a decade without being displaced by some other

15   proprietary standard (such as Sony's Memory Stick, which Samsung alleges enjoyed commercial

16   success, TAC ¶¶ 50, 95).  Divining Samsung's purported injuries based on a comparison to such an

17   imaginary but-for world "would be entirely speculative and beyond the competence of a judicial

18   proceeding," requiring the Court to create "in hindsight a technological universe that never came

19   into existence."  *Kloth v. Microsoft Corp.*, 444 F.3d 312, 324 (4th Cir. 2006) (following *Associated*

20   *Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 545 (1983)

21   ("*AGC*").  Accordingly, Samsung's allegations are plainly insufficient to allege antitrust injury.

22   *See, e.g.*, *AGC*, 459 U.S. at 545 (no antitrust injury when causal link is "tenuous and speculative");

23   ECF No. 104 at 7 ("Plaintiff's theory of damages is too attenuated, indirect, and remote to

24   constitute cognizable antitrust injury.").

25

26

27

28

## II.     SAMSUNG CANNOT STATE A VIABLE ANTITRUST CLAIM BECAUSE IT CANNOT ALLEGE THAT THE SD-3C POOL LICENSE RESTRAINED INDIVIDUAL LICENSING

Samsung's antitrust claims are also unsustainable because of its inability to allege that the individual members of the SD Group — Panasonic, Toshiba and SanDisk — were barred from offering individual licenses to their essential patents.  Samsung's conclusory assertions to the contrary are contradicted by the facts it pleads.

### A.     The Alleged Agreements Expressly Allow Independent Licensing

The undisputed terms of the 2006 License are clear: each SD Card Licensee "has the right to separately negotiate a license with any or all SD Group members under any and all Essential Patent Claims Licensable by each such SD Group member under the terms and conditions to be independently negotiated by each such member."  *See* Torpey Decl. Ex. 2 § 12.5; *see also id.* at 1.

Article 2.5 of the Second Amended and Restated SD Master Licensing Agreement among Panasonic, SanDisk, and Toshiba similarly provides for such individual licensing:

> WHEREAS, nothing in this Agreement precludes any member of the SD Group from licensing or sublicensing rights under its own Essential Patent Claims to make, use or sell any products or services.
>
> ***
>
> Article 2.5:  Each member of the SD Group or its Affiliates shall retain the right, and is free to grant Patent Right(s) and other licensees on an individual basis to Third Parties under their respective patents for products, whether or not conforming to the SD Specifications.

Torpey Decl. Ex. 3 at 2, 8.[9]

With no restriction on individual licensing, the SD Card License is simply another option available to would-be licensees and thus cannot constitute a restraint of trade.  *See, e.g.*, *Columbia Broad. Sys., Inc. v. Am. Soc'y of Composers*, 620 F.2d 930, 936 (2d Cir. 1980); *see also Akanthos Capital Mgmt., LLC v. Atlanticus Holdings Corp.*, 734 F.3d 1269, 1277 (11th Cir. 2013); *Nero AG v. MPEG LA, L.L.C.* (*Nero I*), No. 10-cv-3672, 2010 WL 4366448, at *6 (C.D. Cal. Sept. 14,

---

[9] In light of the TAC's repeated references to this agreement, *see, e.g.*, TAC ¶¶ 15, 152, 154 ("agreements among Panasonic, SanDisk, Toshiba and SD-3C"), it has been incorporated by reference into the TAC and is properly before this Court.  *See, e.g.*, *Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005) (documents are incorporated where "the plaintiff's claim depends on the contents of a document … even though the plaintiff does not explicitly allege the contents of that document in the complaint"); *see* Defs.' Req. for Judicial Notice.

2010); *Sumitomo Mitsubishi Silicon Corp. v. MEMC Elec. Materials, Inc.*, No. 05-2133, 2007 WL 2318903, at \*15 (N.D. Cal. Aug. 13, 2007); *Matsushita Elec. Indus. Co. v. Cinram Int'l, Inc.*, 299 F. Supp. 2d 370, 376-79 (D. Del. 2004).

### B.   Samsung Alleges No Facts Plausibly to Contradict the Contractual Freedom to Individually License the Essential Patents in the SD-3C Patent Pool

To overcome the express contractual freedom to individually license SD Card patents, Samsung must allege facts that plausibly demonstrate that the SD Group somehow still deprived Samsung of any "'realistic opportunity' as a 'practical matter'" to obtain individual licenses from individual owners as opposed to a single license from the pool." *Cinram*, 299 F. Supp. 2d at 377. As the TAC's allegations and incorporated documents make clear, Samsung cannot meet this standard.

*First*, Samsung makes the conclusory assertion that the express individual licensing terms are "contrary to the position taken by the individual members of the SD Group" because no SD Group member ever "indicated a willingness to negotiate a separate license." *See* TAC ¶¶ 128, 134.[10] But Samsung does not plausibly allege any *agreement* to restrict the SD Group members' ability to offer individual licenses.  Indeed, Samsung never alleges that it or any other company was ever *actually denied* a request to pursue negotiations for individual licenses.

To the contrary, the TAC's allegations and incorporated documents demonstrate that Samsung did, in fact, negotiate individually with Panasonic regarding its SD Card essential patents. *See* TAC ¶ 139 (quoting letter from Panasonic to Samsung regarding the licensing of Panasonic's SD Card patents).  These same allegations also incorporate a letter that Samsung sent to Panasonic earlier in the course of that negotiation, which contains an affirmative statement by Samsung that it had *already concluded individual negotiations with SanDisk and Toshiba*, resulting in both

---

[10] While Samsung disparages these express terms as an "illusion," *see* TAC ¶ 133, the plain language of the incorporated document controls over conclusory allegations to the contrary.  *See Sprewell v. Golden State Warriors*, 266 F.3d 979, 990 (9th Cir. 2001); *Wuxi Multimedia, Ltd. v. Koninklijke Philips Elecs., N.V.*, No. 4cv1136, 2006 WL 6667002, at \*8 (S.D. Cal. Jan. 5, 2006) (dismissing claims contradicting terms of the incorporated license agreement), *aff'd*, 280 F. App'x 968 (Fed. Cir. 2008).

1    companies "substantially modifying their license agreements with Samsung" regarding SD Cards.

2    *See* Torpey Decl. Ex. 4; TAC ¶ 136.[11]

3         The TAC allegations and incorporated documents thus show that not only were individual

4    patent license negotiations realistically feasible, they actually happened on more than one occasion.

5    These facts preclude any plausible inference that the SD Group agreed to or collectively denied

6    Samsung a realistic or practical opportunity to negotiate for individual rights to SD Card essential

7    patents.  *See Columbia Broad.*, 620 F.2d at 936; *Sumitomo*, 2007 WL 2318903, at *15; *see also In*

8    *re TFT-LCD Antitrust Litig.*, 586 F. Supp. 2d 1109, 1117 (N.D. Cal. 2008) (plaintiff must allege

9    conspirators "joined the conspiracy and played some role in it because, at the heart of an antitrust

10   conspiracy is an agreement and a conscious decision by each defendant to join it").

11        **Second**, Samsung asserts that it had no "practical alternative" to the SD Card License

12   because the SD Group members refused to negotiate over the terms of the 2003 SD Card License or

13   the 2006 License.  *See* TAC ¶¶ 119-24.  But this is a non-sequitur.  Whether the SD Group offered

14   their *pooled* patents to Samsung at set, non-negotiable terms (including a 6% royalty), is irrelevant

15   to the availability of *individual* licenses.

16        **Third**, Samsung points to the purported difficulty of negotiating individual patent licenses

17   due to the purported refusal of SD Group members to identify which essential patents they

18   individually own.  TAC ¶¶ 70, 135-38.  This position is similarly unavailing.  The feasibility of

19   acquiring individual licenses does not hinge on whether a patent pool or its members identify the

20   patents essential to practicing the standard.  Courts have rejected the notion advanced by Samsung

21   that the minimal burden of having to determine which standards-essential patents one must license

22   equates to a denial of individual licenses by a patent pool or its members.  *See Nero II*, 2010 WL

23   4878835, at *2 ("[T]he time and effort [the plaintiff] will have to expend to determine which

24   patents it needs to license … is irrelevant to the feasibility determination.").

25

26   ───────────────────────────

27   [11] The Court may take judicial notice of this letter because it contains material that underlies
     Samsung's allegations.  *Compare* Torpey Decl. Ex. 4 (discussing "29 Panasonic patents that are
     allegedly essential to the SD Card standards"), *with* TAC ¶ 136 ("Panasonic … eventually showed
28   Samsung a list of 29 patents Panasonic 'believe[d] are SD essential patents …."); *see supra* n.9.

1    **Fourth**, Samsung attempts to sidestep its inability to plead the unavailability of individual

2    SD Card *patent* licenses by alleging that other intellectual property — the SD Card Specification,

3    logo, and other trademarks — may only be obtained through the SD Card License.  *See* TAC ¶ 131.

4    This, too, is irrelevant.  The ability of Samsung and other companies to acquire individual licenses

5    for SD Card essential patents is in no way "restrained" simply because certain forms of intellectual

6    property, such as the SD Card logo, may only be obtained through an SD Card License.

7        Indeed, Samsung's focus on non-patent intellectual property in this context is entirely

8    misplaced.  Even accepting as true the allegation that the SD Card Specification, logo, and other

9    trademarks may only be obtained with an SD Card License, Samsung acknowledges that SD-3C

10   exclusively possesses the right to license this intellectual property and is therefore the ***only*** entity

11   that can license it.  *See* TAC ¶ 131.  "[T]here is nothing inherently anti-competitive about the

12   practice" of insisting that licensees use the SD Card logo and trademarks for products in

13   compliance with the SD Card standard.  *See Int'l Norcent Tech. v. Koninklijke Philips Elecs. N.V.*,

14   2007 WL 4976364, at *1, 3, 11, 15-16 (C.D. Cal. Oct. 29, 2007) (dismissing complaint where

15   patent pool allegedly restrained trade by charging for the DVD standard and logo).

16   **III.    SAMSUNG FAILS TO STATE AN ANTITRUST CLAIM AGAINST SD-3C'S
             PATENT-LICENSING PRACTICES OR THE SD CARD STANDARD-SETTING
17           PROCESS**

18       As a matter of law, Samsung cannot base an antitrust claim on the SD Group's alleged:

19   (1) joint licensing of their SD Card patents at a single 6% royalty rate; (2) entry into royalty-free

20   cross-licenses with one another; (3) inclusion of non-exclusive grantback provisions in the SD Card

21   Licenses; or (4) development and promotion of the SD Card standard at the expense of competing

22   (*e.g.*, MMC) formats.  Courts have repeatedly found that these types of standard-setting and

23   licensing practices, both individually and cumulatively, constitute procompetitive conduct that

24   cannot support a Sherman Act claim.

25       **A.    Samsung Fails to State a Viable Price-Fixing Claim Based on the
                 6% Royalty in the 2003 and 2006 License Agreements**

26       Because SD-3C issues SD Card licenses as a joint venture, "the pricing policy challenged

27   … amounts to little more than price setting by a single entity."  *Texaco Inc. v. Dagher*, 547 U.S. 1,

28

1    6 (2006).  Accordingly, to state an antitrust claim, Samsung must allege facts to show "that [SD-

2    3C's] creation was anticompetitive under the rule of reason"[12] and that the joint venture

3    "produce[d] significant anticompetitive effects."  *Tanaka v. Univ. of S. Cal.*, 252 F.3d 1059, 1063

4    (9th Cir. 2001); *see U.S. Healthcare, Inc. v. Healthsource, Inc.*, 986 F.2d 589, 596 (1st Cir. 1993)

5    (no rule of reason violation "[a]bsent a compelling showing of foreclosure [of competition] of

6    substantial dimensions").  Samsung alleges neither and the TAC establishes its inability to do so.

7         It is well established that joint ventures in the patent pool context have procompetitive

8    effects, including "integrating complementary technologies, reducing transaction costs, clearing

9    blocking positions, and avoiding costly infringement litigation."  *U.S. Philips Corp. v. ITC*, 424

10   F.3d 1179, 1192 (Fed. Cir. 2005); *Sumitomo*, 2007 WL 2318903, at *15; *see Standard Oil Co. v.

11   United States*, 283 U.S. 163 (1961) (competitor patent pool).  Samsung acknowledges that each SD

12   Group member holds blocking patents, *see, e.g.*, TAC ¶¶ 33, 64-65, and thus concedes the existence

13   of such procompetitive effects here.  *See Bos. Scientific Corp. v. Schneider (Eur.) AG*, 983 F. Supp.

14   245, 271 (D. Mass. 1997) (no claim for unlawful pooling where plaintiff's complaint indicates

15   blocking patents are at issue).[13]

16        Samsung also fails to plausibly allege that the SD-3C patent pool unreasonably diminished

17   competition.  Notably, Samsung does not allege that the patents in the pool are reasonably

18   interchangeable or competitive with one another.  *See Wuxi*, 2006 WL 6667002, at *10 (rejecting

19   antitrust claim against a patent pool where plaintiffs "failed to sufficiently allege [that] these

20   patents are competing products").  Indeed, the TAC alleges that competing standards continued to

21   be released well after the pool's formation.  TAC ¶ 95.

22        Samsung appears to claim that the SD-3C patent pool is anticompetitive because it includes

23   some patents that are not essential to implementing the SD Specification.  TAC ¶¶ 62-63.  But

24   Samsung "fail[s] to identify [with any degree of specificity] which of the … patents included in the

---

25   [12] *Id.*, at 6 n.1; *see Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 500-01 (1988).

26   [13] *See also Carpet Seaming Tape Licensing Corp. v. Best Seam Inc.*, 616 F.2d 1133, 1142 (9th Cir.
     1980) ("A well-recognized legitimate purpose for a pooling agreement is exchange of blocking

27   patents."); *Int'l Mfg. Co. v. Landon, Inc.*, 336 F.2d 723, 729 (9th Cir. 1964) ("In a case involving
     blocking patents such [a patent pooling and licensing] arrangement is the only reasonable method

28   for making the invention available to the public.").

1   pool are not essential … [or] provide any facts to support [its] allegation that those patents are

2   actually nonessential." *Wuxi*, 2006 WL6667002, at *5.  Moreover, Samsung fails to identify any

3   "significant anticompetitive effects" stemming from the alleged inclusion of such non-essential

4   patents. *Tanaka*, 252 F.3d at 1063.[14]  Samsung instead admits that SD-3C licenses all of the

5   patents in its pool for a fixed rate, without imposing any requirement that licensees make use of all

6   the licensed patents. *See, e.g.*, TAC ¶ 106.  As such, "there is no evidence that a portion of the

7   royalty" charged by SD-3C is "attributable to the patents that [Samsung] characterize[s]" —

8   without identifying them — "as nonessential."  *U.S. Philips Corp.*, 424 F.3d at 1189.  There is thus

9   "no basis for conjecture that a hypothetical licensing fee would have been lower if [SD-3C] had

10  offered to license the patents on an individual basis or in smaller packages" (*i.e.*, without the

11  alleged "nonessential" patents). *Id.*

12          **B.        Samsung Fails to State a Viable "Price-Squeeze" Claim**

13          Samsung's allegation that the SD Group squeezed Samsung's profit margins by setting a

14  6% patent royalty for SD Card technology while selling SD Cards at lower retail prices does not

15  give rise to an antitrust claim.  *See* TAC ¶¶ 155, 159-60.  It is well established that such "price-

16  squeeze" claims are not cognizable.  As the Supreme Court has held, the antitrust laws impose no

17  duty on vertically integrated companies to leave their rivals "a 'fair' or 'adequate' margin between

18  the wholesale price and the retail price."  *Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S.

19  438, 449 (2009).[15]  This is the law for good reason: a "price-squeeze" often "bring[s] about

20  economic benefits" in the form of lower prices to consumers.  *Town of Concord v. Bos. Edison Co.*,

21  915 F.2d 17, 24 (1st Cir. 1990).  Recognizing "price-squeeze" claims would require courts

22

23

24  [14] *See also Koninklijke Philips N.V. v. Cinram Int'l, Inc.*, 2013 WL 2301955, *4-5 (S.D.N.Y. May 24, 2013).

25  [15] *See also Brulotte v. Thys Co.*, 379 U.S. 29, 33 (1964) ("A patent empowers the owner to exact royalties as high as he can negotiate …."); *U.S. Philips Corp.*, 424 F.3d at 1191-92 (not

26  anticompetitive for patentee to "charge whatever maximum amount a willing licensee is able to pay"); *Morris Commc'ns Corp. v. PGA Tour, Inc.*, 364 F.3d 1288, 1298 (11th Cir. 2004) ("[A]

27  company — even a monopolist company — that expends time and money to create a valuable product does not violate the antitrust laws when it declines to provide that product to its

28  competitors for free.").

1    "simultaneously to police both the wholesale and retail prices," an administrative role to which

2    courts are particularly ill-suited.   *linkLine*, 555 U.S. at 453-54.

3         **C.       Samsung Fails to State a Claim Based on Royalty-Free Cross-Licenses**

4         Samsung's claim that the SD Group violated the antitrust laws by entering into royalty-free

5    cross-licenses with one another, thereby giving themselves a "permanent cost advantage," TAC

6    ¶ 169, is similarly without legal basis.  Indeed, courts have consistently rejected claims that cross-

7    licensing arrangements like those at issue here are anticompetitive.  *See, e.g.*, *Sumitomo*, 2007 WL

8    2318903, at *15; *Wuxi*, 2006 WL 6667002, at *6; *Cinram*, 299 F. Supp. 2d at 372-76.

9         The *Norcent* case is illustrative.  There, the plaintiff, like Samsung, asserted that it could

10   "not reasonably compete" with members of a patent pool, who "favored other members because

11   they did not charge each other royalties."  2007 WL 4976364, at *3, *11 n.76.  The court held that

12   this allegation did not support an antitrust claim.  *Id.*  The court explained that patent pool members

13   who cross-license their technologies do not impermissibly favor themselves by "pay[ing] nothing,"

14   TAC ¶ 4, as Samsung has asserted.  Instead, cross-licensing arrangements among patent pool

15   members "resemble barter agreements in which patent holders trade the use of licenses to each

16   other in lieu of paying royalties," and are accordingly permissible under the antitrust laws.

17   *Norcent*, 2007 WL 4976364, at *11 n.76 (explaining that the contention that such commonly used

18   cross-licenses injure competition suggests "that patent pools are inherently anti-competitive," an

19   argument "at odds with well-established law") (citing *U.S. Philips Corp.*, 424 F.3d at 1193).

20        Other courts, including the Supreme Court, have similarly rejected claims that patent

21   holders violate the antitrust laws by cross-licensing their technologies to each other in lieu of

22   paying royalties.  *See, e.g.*, *Standard Oil Co.*, 283 U.S. at 172 (no Sherman Act claim despite

23   allegation that cross-licensing enabled defendants to make "gasoline free of royalty" while

24   licensees were required to "pay to them a heavy [royalty] tribute in fees"); *Wuxi*, 2006 WL

25   6667002, at *6; *Cinram*, 299 F. Supp. 2d at 372-76; *Sumitomo*, 2007 WL 2318903, at *15.  These

26   authorities require the dismissal of Samsung's antitrust claims as a matter of law.

27

28

**D.** **Samsung Fails to State a Claim Based on Non-Exclusive Grantback Provisions**

Samsung asserts that the grantback provision in the SD Card License violates the antitrust laws by diminishing the financial rewards "that licensees can expect to receive … for developing technology for use in SD Cards and submitting the technology for inclusion in the Specification." TAC ¶ 141. Samsung lacks antitrust standing to raise such a challenge, which in any event fails as a matter of law.

Samsung alleges no facts to support a plausible causal link between the alleged diminished rewards it identifies and any purported harm to Samsung. *See* TAC ¶¶ 141, 176. Instead, Samsung merely speculates that the SD Card License's grantback provision *might* have diminished the incentives of unnamed persons to develop unidentified technologies that *might* have benefitted Samsung in some unspecified way. This is a far cry from "establish[ing] with reasonable probability the existence of some causal connection between [a] defendant's wrongful act and some loss of anticipated revenue" flowing from the grantback provision. *Flintkote Co. v. Lysfjord*, 246 F.2d 368, 392 (9th Cir. 1957). Samsung thus lacks standing to challenge the provision. *See id.*; *see also Kloth*, 444 F.3d at 323 ("[T]he harms that the plaintiffs have alleged with respect to the loss of competitive technologies are so diffuse that they could not possibly be adequately measured.").

Even if Samsung could sufficiently allege standing, a "non-exclusive" grantback provision like the one at issue here, *see* Torpey Decl., Ex. 2 § 2.4; TAC ¶ 140, cannot give rise to an antitrust claim. Instead, courts and antitrust scholars alike have recognized that such grantback provisions "can have procompetitive effects," *Norcent*, 2007 WL 4976364, at *2 n.18, and that "[n]onexclusive grantback clauses are virtually always competitive," 1 Herbert Hovenkamp et al., *IP and Antitrust* § 25.2, at 25-2 (2d ed. Supp. 2013); *id.* at 25-3 ("Unless the grantback provision gives the patentee the exclusive right to practice the improvement, anticompetitive consequences are hard to identify.").[16] This is because non-exclusive grantbacks allow a licensee "to practice its

---

[16] Grantbacks "may be necessary to ensure that the licensor is not prevented from effectively competing because it is denied access to improvements developed with the aid of its own technology." *Norcent*, 2007 WL 4976364, at *2 n.18; *Santa Fe-Pomeroy, Inc. v. P & Z Co.*, 569 F.2d 1084, 1101 n.34 (9th Cir. 1978) ("[T]he licensor is entitled to some protection for its original investment … and … a grant back is a reasonable device through which to seek such protection.").

1   technology and license it to others," *Norcent*, 2007 WL 4976364, at *2 n.18 (quoting DOJ & FTC,

2   *Antitrust Guidelines for the Licensing of Intellectual Property* § 5.6, at 30 (1995)), and to "remain

3   free to capture whatever value such new patents may have outside the standard," Letter from DOJ

4   to Carey R. Ramos, Esq., Paul, Weiss, Rifkind, Wharton & Garrison (June 10, 1999), 1999 WL

5   392163, at *19.  And Samsung's challenge to Section 2.4 on the basis that licensees would have an

6   even *greater* incentive to innovate if they were allowed to demand royalties for "any new essential

7   technology they might develop," TAC ¶ 141, also fails because "it is not antitrust's purpose … to

8   condemn every agreement that fails to provide the greatest possible incentive to innovate."  1

9   Hovenkamp et al., *supra*, § 25.3, at 25-6.1.[17]

10      For these reasons, courts routinely reject antitrust challenges to non-exclusive, royalty-free

11   grantbacks like the one at issue here.  *See, e.g.*, *PNY Techs.*, 2012 WL 1380271, at *12; *see also* 1

12   Hovenkamp et al., *supra*, § 25.2, at 25-4 n.10 (noting that for over a half-century "the courts have

13   approved virtually all *non*exclusive grantback clauses" and collecting cases).  This Court should do

14   the same.

15      **E.      Samsung Fails to State a Claim Based on Standard-Setting**

16      "[I]ndustry-wide standards for new technology can have decidedly procompetitive effects."

17   *Princo Corp. v. ITC*, 616 F.3d 1318, 1335 (Fed. Cir. 2010) (en banc); *see Golden Bridge Tech., Inc.*

18   *v. Motorola, Inc.*, 547 F.3d 266, 273 (5th Cir. 2008) ("[I]t has long been recognized that the

19   establishment … of … standards is a legitimate and beneficial function.").  Accordingly, standard-

20   setting of the type at issue in the TAC is not a restraint of trade "unless it amounts to coercion or

21   encompasses other anticompetitive conduct."  *Norcent*, 2007 WL 4976364, at *7.  To meet that

22   standard, "normally there is a showing that the standard was deliberately distorted … through lies,

23   bribes, or other improper forms of influence, in addition to a further showing of market

24   foreclosure."  *DM Research, Inc. v. Coll. of Am. Pathologists*, 170 F.3d 53, 57-58 (1st Cir. 1999);

25   *see Schachar v. Am. Acad. of Ophthalmology, Inc.*, 870 F.2d 397, 399 (7th Cir. 1989) (Easterbrook,

26

27   ---
   [17] *See also id.* ("[A]lmost any license agreement probably contains provisions that could be omitted

28   or rewritten so as to create greater incentives to innovate.  But antitrust intervenes only when a type
    of practice as a class can be said to pose significant competitive risks.").

1   J.) (standard-setting violation typically may be found only where "members boycott[] those who

2   f[a]ll out of step" or "agree[] not to manufacture, distribute, or purchase certain types of products").

3           While Samsung alleges in conclusory terms that the SD Group members "manipulate[d] the

4   SD [Card] Specification," TAC ¶ 64, the TAC lacks any of the requisite "factual allegations" to

5   plausibly support such a "legal conclusion." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

6           ***First***, Samsung alleges that the purported "manipulation" was that SD Group members

7   favored their own intellectual property, TAC ¶¶ 4, 64, but such conduct is perfectly lawful in the

8   context of standard-setting. *See Clamp-All Corp. v. Cast Iron Soil Pipe Inst.*, 851 F.2d 478, 488

9   (1st Cir. 1988) (Breyer, J.) (companies need not "develop a specification for, or somehow 'certify,'

10  a competitor's … product"); *Nero II*, 2010 WL 4878835, at *3 (plaintiff "is not entitled to a patent

11  pool customized … to [the licensee's] precise needs"). The SD Group's alleged inclusion of

12  "specific technology" or "particular solution[s]" that do not affect "essential" or "central features of

13  the card," TAC ¶¶ 10, 164, 175, is likewise not an antitrust violation. To hold otherwise would

14  require this Court to evaluate whether each of the elements of the SD Specification relates to an

15  undefined "central" function — precisely the type of rudderless technical inquiry that the Ninth

16  Circuit has cautioned courts to avoid. *See Allied Orthopedic Appliances Inc. v. Tyco Health Care*

17  *Grp.*, 592 F.3d 991, 1000 (9th Cir. 2010) ("Antitrust scholars have long recognized the

18  undesirability of having courts oversee product design ….").[18]

19          ***Second***, there is no plausible basis alleged for Samsung's conclusory assertion that the SD

20  Group members "combin[ed] their respective market weights" to coerce adoption of the SD Card.

21  TAC ¶ 73. Indeed, Samsung fails to identify a single instance of such "coercion" anywhere in the

22  TAC. *See Nero II*, 2010 WL 4878835, at *4 (no plausible facts of coercion); *Norcent*, 2007 WL

23  4976364, at *9 (plaintiff must plead "facts regarding the alleged compulsion and coercion — for

24  example, *who* coerced *whom*, *when* the coercion took place, *how* the coercion was effected, and

25  *what* comprised the conspiracy"). To the contrary, the TAC pleads that companies adopted the SD

26  _____

27  [18] *See also* 13 Herbert Hovenkamp, *Antitrust Law* ¶ 2233, at 463 (3d ed. 2012) ("A rule permitting the development of a standard but requiring the defendants to choose the 'best' technology, even if other than their own, would place the antitrust tribunal in the unacceptable position of having to

28  identify the best technology.").

1   Card standard because the SD Group made royalty-free licenses available to host device

2   manufacturers and maintained compatibility with competing MMC Cards.  TAC ¶ 75.  As the

3   *Norcent* court points out, no case "holds, or even intimates, that such behavior is prohibited."  2007

4   WL 4976364, at *7 n.51; *see supra* Section I.

5        **Third**, Samsung cannot state an antitrust claim by alleging that the SD Group developed the

6   initial SD Card Specification "in a closed process from which other industry participants were

7   excluded."  TAC ¶ 51.  To the contrary, "[s]electivity in the membership of a joint venture often

8   enhances a joint venture's procompetitive potential."  *SCFC ILC, Inc. v. Visa USA, Inc.*, 36 F.3d

9   958, 972 n.20 (10th Cir. 1994) (quoting DOJ, *Antitrust Guidelines for Int'l Operations* 42 (1988)).

10  Competitors have no duty to include all industry participants in the development of standards or to

11  work within existing standard-setting organizations.  *See id.*[19]  Imposing such a duty would

12  decrease the incentive to form joint ventures capable of realizing market efficiencies.  *SCFC ILC*,

13  36 F.3d at 972 n.20.

14        **Finally**, Samsung pleads no facts to support its conclusory assertion that the SD Group

15  members "agreed not to support the development of formats that could compete with the SD Card."

16  TAC ¶ 183.  Samsung alleges neither "facts such as a specific time, place, or person involved in the

17  alleged conspiracies" nor any "plausible grounds to infer an agreement" of this type.  *See Kendall*

18  *v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1047 (9th Cir. 2008).  To the contrary, it acknowledges

19  SanDisk's support of the SIM card standard based on USB, which was adopted as a standard by

20  ETSI.  *See* TAC ¶ 84; *supra* at 5.

21  **IV.    SAMSUNG FAILS ADEQUATELY TO PLEAD MARKET POWER IN ANY**
          **RELEVANT MARKET**
22

23        Samsung alleges four separate markets in the TAC's "Relevant Markets" section:  (1) a

24  "Full-Size SD Card market;" (2) a "Reduced-Size SD Card Market;" (3) an "SD Card Technology

25  ─────────────────────
    [19] *See also Golden Bridge*, 547 F.3d at 273 (While standard-setting "involves collective action by
26  competitors" and "must exclude some products," these actions "are not … antitrust violations."); 13
    Hovenkamp, *supra*, ¶ 2200, at 271 ("'[C]losed membership' joint venture[s]" have "no general
27  antitrust duty to admit additional members."); 2 Hovenkamp et al., *IP and Antitrust* § 35.3, at 35-24
    (2d ed. Supp. 2014) (antitrust concerns with closed standard-setting organizations are allayed if
28  there remains "competitor access … to the use of the standard itself").

1  market;" and (4) a "Flash Memory Card Market."  TAC ¶¶ 162-65.  Samsung then aggregates the

2  first two of these alleged markets in a purported fifth "SD Card Market."  TAC ¶ 163.  The TAC

3  should be dismissed because the alleged market definitions are implausible,[20] and because even if

4  they were properly alleged, Samsung has failed to adequately plead market power.[21]

5     **A.      Samsung Fails to Allege that Defendants Had Market Power in the
              Implausible "SD Card Market" and the "Flash Memory Card Market"**

6

7        Samsung defines the alleged "Full-Size SD Card Market" and "Reduced-Size SD Card

8  Market" as encompassing finished SD Cards sold for use in devices that contain slots for large and

9  small SD Cards, respectively.  TAC ¶¶ 162-63.  However, Samsung never alleges that Defendants

10  have power in either of these allegedly distinct markets, instead jettisoning them in favor of a

11  purported "SD Card Market" apparently comprising both Full-Size *and* Reduced-Size SD Cards.

12  TAC ¶¶ 161, 167-72 (alleging that Panasonic and SD-3C conspired to restrain trade "in the SD

13  Card market").  The "SD Card Market" must be rejected as implausible because Samsung

14  affirmatively alleges facts which show that the products within that "market" are not

15  interchangeable (*e.g.*, consumers faced with an increase in the price of Reduced-Size SD Cards

16  would not shift their purchase to a Full-Size SD Card instead).  *See* TAC ¶ 37 ("A given flash

17  memory card can be used only in host devices that have a compatible slot corresponding to that

18  card's 'form factor' (the size and shape of the card)"); *id.* ¶ 163 ("Consumers with devices

19  equipped only with a Reduced-Size SD card slot would not regard any other kind of flash memory

20  card as a reasonably interchangeable alternative to a Reduced-Size SD Card."); *id.* ¶ 162 (similar

21  statement regarding Full-Size SD Cards); *see also Eastman Kodak Co. v. Image Technical Servs.*,

22  504 U.S. 451, 469-70 (1992) (products are only in the same market if "consumers will change their

23  consumption of one product in response to a price change in another"); *Tanaka*, 252 F.3d at 1063-

24  64 (rejecting plaintiff's purported relevant market of college soccer in the Los Angeles area that

25

---

26  [20] *See Newcal Indus. v. Ikon Office Solution*, 513 F.3d 1038, 1045 (9th Cir. 2008) ("[A] complaint
     may be dismissed under Rule 12(b)(6) if the complaint's 'relevant market' definition is facially
27  unsustainable.").

28  [21] *See Rick-Mik Enters. v. Equilon Enters.*, 532 F.3d 963, 972 (9th Cir. 2008) ("A failure to allege
     power in the relevant market is a sufficient ground to dismiss an antitrust complaint.").

1    was contradicted by her own claim that she was nationally recruited).  This requires dismissal of

2    Claim I of the TAC.  *See Spindler v. Johnson & Johnson Corp.*, No. C 10-01414 JSW, 2011 WL

3    12557884, at *3 (N.D. Cal. Aug. 1, 2011) (White, J.) (dismissing complaint where plaintiffs failed

4    to allege that all products encompassed by that market definition were "reasonably

5    interchangeable"); *see also Queen City Pizza, Inc. v. Domino's Pizza Inc*., 124 F.3d 430, 436 (3d

6    Cir. 1997) (same).

7          Samsung's alleged "Flash Memory Card Market," which would encompass the "SD Card

8    Market" plus all other flash memory cards such as MMC, CompactFlash, and Mega Storage Device

9    Cards, TAC ¶¶ 42-45, 165, fails for the same reasons.  Samsung alleges that different flash memory

10    cards function only in compatible devices, which precludes it from alleging that all flash memory

11    cards are interchangeable.  *See* TAC ¶ 37.  Accordingly, Claim III of the TAC must be dismissed.

12    *See Eastman Kodak Co.*, 504 U.S. at 469-70; *Spindler*, 2011 WL 12557884, at *3.

13          Even if they properly alleged the relevant markets asserted, Claims I and III must be

14    dismissed because Samsung has not plausibly alleged that Panasonic or SD-3C possesses market

15    power in either of those alleged product markets.  Samsung's bare allegations that the SD Group

16    (*i.e.*, SanDisk, Panasonic, and Toshiba) "collectively" accounts for "at least 65 percent" of an

17    undefined worldwide market, and "greater than 70 percent" of a U.S. market, for "SD Cards," and

18    that in 2005, "SanDisk, Panasonic and Toshiba held approximately 50 percent of the worldwide

19    market share for flash memory cards" do not come close to meeting its burden.  TAC ¶¶ 92, 161;

20    *see Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).[22]  Samsung's vague allegations that,

21    "[u]pon information and belief," the SD Group members have dominant market shares, and its

22    conclusory assertions that the SD Group members *collectively* control the alleged relevant markets

23    via the SD Card License, TAC ¶¶ 161, 169, 183, cannot fill the gap in the absence of any specific

24    factual allegations to plausibly support them.  *See Solis v. City of Fresno*, No. 1:11-CV-00053,

25    2012 WL 868681, at *8 (E.D. Cal. Mar. 13, 2012) ("In the post-*Twombly* and *Iqbal* era, pleading

26

27

28

---

[22] Tellingly, Samsung makes no allegation about its own SD Card market shares, which, if pled, would be much larger than that of Panasonic.

1   on information and belief, without more, is insufficient to survive a motion to dismiss for failure to

2   state a claim."); *see also Twombly*, 550 U.S. at 553-56, 557, 570.

3       **B.    Samsung Fails Plausibly to Allege Monopoly Power in an Untenable**
        **"Technology Market"**
4

5       Samsung also alleges a purported relevant market made up of "the technology used in the

6   production of SD Cards, consisting of technology developed for this end-use or that might be

7   applied toward this end-use."  TAC ¶¶ 164, 173-79, 187-207 (relating to Claims II, IV, and V).  But

8   this so-called "SD Card Technology Market" is implausibly broad on its face and fundamentally

9   dissimilar to technology markets that have been approved by courts in the standards-setting context.

10      As this Court has held, a "technology market" consists of "substitute or alternative …

11  technologies that were competing before the standard was adopted to perform the function that is

12  covered by the standard and the essential patent."  *ChriMar Sys., Inc. v. Cisco Sys., Inc.*, No. C 13-

13  01300 JSW, 2014 WL 5477666, at *3 (N.D. Cal. Oct. 29, 2014) (White, J.); *see also* DOJ & FTC,

14  *supra*, § 3.2.2, at 8 (defining technology markets as "technologies or goods that are close enough

15  substitutes significantly to constrain the exercise of market power with respect to the intellectual

16  property that is licensed"); *Hynix Semiconductor Inc. v. Rambus Inc*., No. CV-00-20905 RMW,

17  2008 WL 73689, at *4 (N.D. Cal. Jan. 5, 2008) (the inquiry is focused on whether two technologies

18  are economically substitutable and "accomplish a similar function").

19      Here, by contrast, Samsung claims that the SD Group members hold essential patents

20  covering *some* features of SD Cards, but that the relevant market nevertheless consists of *all* SD

21  Card technology and *all* of its potential substitutes.  TAC ¶¶ 164, 175.  Such allegations are

22  incoherent.  **First**, to the extent that each member of the SD Group owns essential patents, those

23  patents are by definition complements and ***not substitutes*** for each other.  Each is necessary to

24  implement the SD Card specifications and they are not interchangeable.  **Second**, as Samsung

25  concedes, finished SD Cards incorporate a wide variety of distinct technologies with different

26  purposes and different potential substitutes, including memory cells, flash memory chips,

27  controllers, and write protection features, all of which are distinct technologies.  TAC ¶¶ 29-35, 64.

28

1 Samsung does not — and cannot — allege that all of these technologies are interchangeable with

2 each other. Samsung's broad "technology" market is thus not sustainable and each of the claims in

3 the TAC premised on this market definition must be dismissed. *See Newcal Indus.*, 513 F.3d at

4 1045 ("[T]he market must encompass the product at issue as well as all economic substitutes for the

5 product."); *Tessera, Inc. v. Micron Tech., Inc.*, No. 2:05CV94, 2005 WL 1661106, at *3 (E.D. Tex.

6 July 14, 2005) (dismissing complaint that alleged technology markets that encompassed "all

7 technology components of a finished product").

8       Nor can Samsung save its market power allegations by resorting to the fact that SD Group

9 members own and license essential SD Card patents. TAC ¶¶ 175-76, 188-89. This is insufficient

10 to support a claim that the SD Group exercised power in a technology market. *See Ill. Tool Works*

11 *Inc. v. Indep. Ink, Inc*., 547 U.S. 28, 45 (2005) ("[A] patent does not necessarily confer market

12 power upon the patentee."); *Minebea Co. v. Papst*, 444 F. Supp. 2d 68, 217 (D.D.C. 2006) ("The

13 concept of having impermissible market power in a 'technology market' consisting merely of one's

14 own patents has never been adopted by the Supreme Court, by the Federal Circuit, or by any other

15 court of appeals. Indeed, it has been expressly rejected by courts that have considered the issue.");

16 *see also ChriMar Sys., Inc.*, 2014 WL 5477666, at *3-4 (rejecting plaintiff's contention that

17 defendant's ownership of an essential patent conferred monopoly power). Critically, Samsung

18 would have to allege facts constituting evidence of "restricted output and supracompetitive prices"

19 or any other economic indicator of market power being exercised. *See, e.g.*, *Rebel Oil Co. v. Atl.*

20 *Richfield Co*., 51 F.3d 1421, 1434 (9th Cir. 1995). It has not, and cannot. Accordingly, Claims II,

21 IV, and V must be dismissed. *See* TAC ¶ 189.

22 **V. SAMSUNG HAS NOT ALLEGED FACTS TO SUPPORT ANY STATE LAW**
23     **CLAIM**

24       Under California law, the Cartwright Act is typically interpreted consistently with the

25 Sherman Act. *Corwin v. L.A. Newspaper Serv. Bureau, Inc.*, 4 Cal. 3d 842, 852 (1971) ("[T]he

26 Cartwright Act w[as] patterned after the Sherman Act and decisions under the latter are applicable

27 to the former."). Although a recent decision clarified that in considering Cartwright Act claims

28

California courts are not technically bound by federal courts' interpretations of the Sherman Act, it recognized that such interpretations are instructive. *Aryeh v. Canon Bus. Solutions, Inc.*, 55 Cal. 4th 1185, 1195 (2013). Accordingly, since *Aryeh*, courts have continued consistently to apply federal courts' interpretation of the Sherman Act to Cartwright Act claims, particularly where, as here, there is no guidance under California law.[23] Samsung's Cartwright Act claims therefore fail for the same reasons its Sherman Act claims do.

Samsung's Section 17200 claim, which it admits derives solely from the allegation that Defendants' "acts and practices … amount to an unlawful business act or practice," TAC ¶ 199, fails for the same reason, as "a violation of another law is a predicate for stating a cause of action under" Section 17200's unlawful prong. *ChriMar Sys., Inc.*, 2014 WL 5477666, at *5; *see Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 20 Cal. 4th 163, 180, 182-83 (1999) ("[S]ection 17200 'borrows' violations of other laws and treats them as unlawful practices that the unfair competition law makes independently actionable.").

Samsung's Section 17200 claim must also be dismissed because it fails to allege that any purportedly anticompetitive conduct "occurred in or emanated from" California. *See Ice Cream Distribs. of Evansville, LLC v. Dreyer's Grand Ice Cream, Inc.*, No. 09-5815 CW, 2010 WL 2198200, at *9 (N.D. Cal. May 28, 2010). The only California conduct that the TAC alleges is that SD-3C sent and received royalty invoices from California. TAC ¶¶ 8, 103, 111-13. This conduct is insufficient to support Samsung's antitrust claims, and thus compels dismissal of its Section 17200 claim as well. *See Ice Cream Distribs. of Evansville, LLC v. Dreyer's Grand Ice Cream, Inc.*, 2010 WL 3619884, at *8-9 (N.D. Cal. Sept. 10, 2010), *aff'd*, 487 F. App'x 362 (9th Cir. 2012).

Nor can Samsung sustain a Section 17200 claim against non-residents Panasonic and PNA on a theory that they conspired with SD-3C. *See* TAC ¶¶ 200-01. In *Standfacts Credit Services,*

---

[23] *See, e.g.*, *Los Gatos Mercantile, Inc. v. E.I. DuPont de Nemours & Co.*, No. 13-cv-01180-BLF, 2014 WL 4774611, at *6 (N.D. Cal. Sept. 22, 2014) (concluding federal antitrust standing law applies to the Cartwright Act); *Medina v. Microsoft Corp.*, No. C14-1043 RS, 2014 WL 4243992, at *3-4 (N.D. Cal. Aug. 26, 2014) (dismissing Cartwright Act and Sherman Act claims under same analysis); *Rheumatology Diagnostics Lab., Inc. v. Aetna, Inc.*, No. 12-cv-05847-WHO, 2014 WL 524076, at *8 n.5, *14 (N.D. Cal. Feb. 6, 2014) (granting motion to dismiss "[b]ecause California's Cartwright Act mirrors the federal Sherman Act, the court analyzes them jointly according to federal law").

1    *Inc. v. Experian Information Solutions, Inc.*, for example, the court held that an alleged antitrust

2    conspiracy could not support a Section 17200 claim against non-resident defendants on a co-

3    conspirator theory because the defendants were not "legally capable of committing the tort" — *i.e.*,

4    they were not capable of participating in a conspiracy that violates Section 17200 — because "the

5    UCL cannot provide the basis for a duty owed by non-resident Defendants … to [a] Non-Resident

6    Plaintiff." 405 F. Supp. 2d 1141, 1148 (C.D. Cal. 2005).

7    **VI.    SAMSUNG DOES NOT STATE ANY CLAIM AGAINST PNA**

8    Finally, the TAC improperly lumps together Panasonic Corporation with PNA, a separate

9    sales subsidiary of Panasonic.  No facts are alleged to show that PNA participated in the SD Group,

10   or that PNA made "an agreement and a conscious decision" to join any alleged conspiracy

11   regarding the SD-3C.  *In re Optical Disk Drive Antitrust Litig.*, No. 3:10 MD-02143-RS, 2011 WL

12   3894376, at *13 (N.D. Cal. Aug. 3, 2011).  To state claims against the Defendants for involvement

13   in a collusive conspiracy, Samsung must allege "that each individual defendant joined the

14   conspiracy and played some role in it because, at the heart of an antitrust conspiracy is an

15   agreement and a conscious decision by each defendant to join it."  *In re Lithium Ion Batteries*

16   *Antitrust Litig.*, No. 13-MD-2420 YGR, 2014 WL 309192, at *13 (N.D. Cal. Jan. 21, 2014).

17   Samsung has wholly failed to allege even a single fact that PNA engaged in any unlawful conduct.

18   The TAC's sole PNA-specific allegations are that PNA hosted the SD Association website

19   and was a distributor of SD Card host devices.  TAC ¶¶ 55, 67, 183.  These two facts cannot

20   support a claim that PNA participated in any wrongful conduct.  *See, e.g.*, *Kendall*, 518 F.3d at

21   1048 (allegations must answer the who, what, when, and where of each defendant's involvement);

22   *see also Medina*, 2014 WL 4243992, at *3.

23   **CONCLUSION**

24   For all of the foregoing reasons, this Court should dismiss Samsung's TAC with prejudice.

25   As Samsung has already had the chance to amend its complaint three times, a further opportunity to

26   amend is not warranted.  *See, e.g.*, *Beckway v. DeShong*, No. C07-5072 TEH, 2010 WL 3768375,

27   at *2-3 (N.D. Cal. Sept. 22, 2010).

28

1    Dated:  February 13, 2015                    Respectfully submitted,

2                                                By: /s/ Jeffrey L. Kessler

3                                                    Jeffrey L. Kessler (*pro hac vice*)
                                                    jkessler@winston.com
4                                                   Aldo A. Badini (SBN 257086)
                                                    abadini@winston.com
5                                                   Susannah P. Torpey (*pro hac vice*)
                                                    storpey@winston.com
6                                                   James F. Lerner (*pro hac vice*)
                                                    jlerner@winston.com
7                                                   WINSTON & STRAWN LLP
                                                    200 Park Avenue
8                                                   New York, NY 10166
                                                    212-294-4601
9                                                   212-294-4700 (fax)

10                                                   Ian L. Papendick (SBN 275648)
                                                    ipapendick@winston.com
11                                                  WINSTON & STRAWN LLP
                                                    101 California Street
12                                                  San Francisco, CA 94111
                                                    415-591-6905
13                                                  415-591-1400 (fax)

14                                                   *Attorneys For Defendants*
                                                    *Panasonic Corporation*
15                                                  *Panasonic Corporation of North America*

16                                                By: /s/ Christopher B. Hockett

17                                                   Christopher B. Hockett (SBN 121539)
                                                    Neal A. Potischman (SBN 254862)
18                                                  William D. Pollak (SBN 293654)
                                                    Brett J. Hartman (SBN 279436)
19                                                  Davis Polk & Wardwell LLP
                                                    1600 El Camino Real
20                                                  Menlo Park, California  94025
                                                    Telephone:(650) 752-2000
21                                                  Facsimile: (650) 752-2111
                                                    Email: chris.hockett@davispolk.com
22                                                  neal.potischman@davispolk.com
                                                    william.pollak@davispolk.com
23                                                  brett.hartman@davispolk.com

24                                                   *Attorneys for Defendant*
                                                    *SD-3C, LLC*
25

26               *Pursuant to N.D. Cal. L.R. 5-1(i)(3), the filer attests that concurrence*
27               *in filing of this document has been obtained from the above signatories*

28
     JOINT NOTICE OF MOTION AND MOTION TO DISMISS                    CASE NO. 4:10-cv-03098-JSW